Ed EDMUNDS, Jr., Ted Edmunds, & Foster Mold, Inc., Appellant,

v.

Bill SANDERS, Appellee.

No. 08–96–00436–CV.

Court of Appeals of Texas, El Paso.

Sept. 16, 1999.

Rehearing Overruled Oct. 6, 1999.

698

John P. Mobbs, Attorney at Law, E. Link Beck, Beck & Given, P.C., El Paso, for Appellant.

Ken Slavin, Brower & Slavin, El Paso, for Appellee.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

## *O P I N I O N*

### RICHARD BARAJAS, Chief Justice.

We withdraw our opinion and judgment of March 18, 1999, overrule Appellee's and Appellants' Motion for Rehearing as moot, and substitute the following opinion. This is an appeal from a jury finding that the Appellants converted a business, converted property which Appellee had contributed to the business, and tortiously interfered with Appellee's prospective contracts with customers. The jury awarded Appellee both actual and punitive damages.

## I. *SUMMARY OF THE EVIDENCE*

Anthony Hilary Foster ("Foster") performed tool-and-die work in Mississippi. He had been in such business for about twenty-five years. In 1987, Foster approached Bill Sanders ("Sanders"), Appellee, who operated a tool-and-die and plastic injection molding business in Destin, Florida, to discuss opening such a business in El Paso. Sanders was the owner and operator of a successful tool-and-die and plastic injection molding business in Florida. Sanders, seeing the potential of such a venture, traveled to El Paso for the purpose of setting up the business and finding a location for the shop. On December 8, 1987, he leased a location at the Gateway Business Park on Gateway East. The space was leased from Commerce Gateway Partners, Ltd. Ted Edmunds and his father, Ed Edmunds, Jr. Appellants, were the property managers for Commerce Gateway Partners, Ltd. Ted Edmunds negotiated the lease with Sanders and Ed Edmunds, Jr. executed the lease.

On January 5, 1988, Foster and Sanders entered into a written agreement regarding their venture. The agreement required Sanders to provide equipment and financing for the business, while Foster was to move to El Paso and run the business. Sanders and Foster dispute wheth-er the agreement, which contained several blank spaces, accurately reflects the arrangement between them. The agreement does not contain any final resolution for Foster's participation in the business which includes the amount of money Foster was required to invest in the business in order to obtain an eventual ownership interest. Sanders testified that Foster really had no funds to invest, which was a primary reason why no final agreement was reached.

In February 1988, Foster moved to El Paso to open and manage the business at the leased location. The term of the lease on the space began February 1, 1988. The business name was Sanders Manufacturing—El Paso. Foster himself filed the Assumed Name Certificate with the El Paso County Clerk establishing Sanders Manufacturing—El Paso, with Sanders listed as the only owner. Sanders Manufacturing—El Paso, began operations in February 1988. Foster believed he owned fifty percent of this sole proprietorship. Sanders provided the tool-and-die machinery which was to be used by the El Paso business.

The record shows that within a few months, Sanders became dissatisfied with the performance of the business although the tool-and-die and plastic injection molding business is said to be a profitable enterprise if properly managed.[1] Foster stated that as early as March 1988, his relationship with Sanders "wasn't too good." Sanders began pressuring Foster to try "to get him on the ball." Sanders and Foster had a heated conversation with Sanders expressing his dissatisfaction with Foster's performance because the business was losing money. Their relationship deteriorated severely after June of 1988. According to Sanders, they were "not communicating very good" in July of 1988. Foster agreed that they had difficulty communicating, beginning in June 1988, continuing through July and August, and

---

1. Ed Edmunds, Jr. testified that Foster was not a good businessman and that he needed help.

worsening thereafter. At approximately the same time, Foster began ignoring Sanders' advice as to how the business should be conducted.

In September of 1988, Sanders concluded that he could not sustain any more losses in the El Paso business. Although he told Foster he would shut down the business if it did not improve, Sanders had no intention of closing his business or walking away from his substantial investment. If Foster was unable to properly manage their business, it was Sanders' intention to come to El Paso and run the shop himself until such a time that he was able to hire another manager for the business.

### Evidence Concerning the Acts of Ed Edmunds, Jr. and Ted Edmunds

At about the same time, Foster approached Ted Edmunds to tell him that he would probably have to close the business because he was broke, that Sanders refused to send additional money, and that Foster had put all the money he had into the business. Ted Edmunds suggested that Foster consult with his father, Ed Edmunds, Jr. because Ed Edmunds, Jr. had significant business experience and Ted Edmunds thought that he could help Foster. Ed Edmunds, Jr. offered Foster advice regarding cash flow, recommended an accounting firm for the business, and helped Foster obtain a line of credit. He also recommended that Foster seek the services of a particular attorney. Ed Edmunds, Jr. reviewed the books of the business without Sanders' knowledge or consent and essentially began to make all decisions related to the business as well as Foster's dealings with Sanders.

Ed Edmunds, Jr. began consulting with Foster in the spring or summer of 1988. The record shows that his role as landlord quickly became one of consultant for Sanders Manufacturing—El Paso. Sanders purportedly had no knowledge that Foster had engaged the services of Ed Edmunds, Jr. The record shows Foster's testimony as follows:

Q. When did you tell Mr. Sanders that you had retained Mr. Edmunds?

A. I don't think I ever told him.

Q. When did you tell Mr. Sanders that you had hired him?

A. I don't think I ever told him that either.

Ed Edmunds, Jr. did not charge Sanders for his services until June 1989, after deciding to invest in the business and to create Foster Mold. Ed Edmunds, Jr. was not charging for his consulting services unless he was successful in putting the business "back on its feet" and then he "would work out a reasonable fee." Although Sanders successfully operated an identical business in Florida, his expertise was neither consulted nor followed after the Edmunds became involved with Sanders Manufacturing—El Paso. Ed Edmunds, Jr., wanting to determine what kind of business Sanders and Foster had, looked over the entire operation. He stated that he was confused about whether the business was a partnership, sole proprietorship, or corporation. Ed Edmunds, Jr. admitted that Foster himself did not know what type of business it was, and he (Ed Edmunds, Jr.) never asked Sanders nor inquired with Sanders regarding what kind of business it was. He did however know that Sanders was wiring cash to the business and furnishing equipment.

Ed Edmunds, Jr. became further involved when he obtained a loan for Sanders Manufacturing—El Paso and personally guaranteed the loan. By reviewing the book and business records, Ed Edmunds, Jr. knew that Sanders Manufacturing—El Paso had good accounts receivable from companies which were all "Fortune 500 companies" with excellent credit. He testified that he did not see any risk in guaranteeing the loan himself because of such receivables and customers. Sometime in the summer of 1988, both Edmunds approached Foster with the idea that they

would invest in Sanders Manufacturing—El Paso. Ed Edmunds, Jr. testified that when other investors were not interested, he and his son, Ted Edmunds, decided that the business would nonetheless be worthwhile. Ed Edmunds, Jr. enlisted the aid of his attorney and accountants for the business, participated in the meetings with his attorney and Foster, advised Foster on what he needed to do for proper cash flow, directed Foster on how to proceed in dealing with Sanders, had daily conversations with Foster about the business, advised Foster to incorporate Sanders' business, assisted in incorporating the business of Sanders, supervised the formation of the new business, told Foster to transfer all the assets of Sanders Manufacturing—El Paso to the newly incorporated Foster Mold & Die, Inc. without Sanders' knowledge, consent or participation, and told Foster's wife, Libby Foster ("Libby"), how to spend the business funds including payments to himself. Foster testified that he believed that Ed Edmunds, Jr. and Ted Edmunds wanted the company for themselves, and that they formed this intent several months before Foster actually left the company.

As noted above, Ed Edmunds, Jr. recommended that Foster secure the services of his attorney. The attorney was of the opinion that Sanders was not complying with the original agreement. On October 6, 1988, with the assistance of the Edmunds' attorney, Foster wrote Sanders demanding that Sanders comply with the terms and conditions of the original agreement. Sanders was unwilling to meet Foster's demands. While Sanders was in El Paso during the week of October 10, he told Foster that he was going to close the business. Sanders gave Foster the option of either purchasing his interest or closing the business. As far as Foster was concerned, their deal was over at that point.

The attorney, on behalf of Foster, filed Articles of Incorporation for Foster Mold & Die, Inc. on October 20, 1988. Without the knowledge or consent of Sanders, all assets and liabilities of Sanders Manufacturing—El Paso were transferred to Foster Mold & Die, Inc. The transfer was done at the direction of Ed Edmunds, Jr. Ed Edmunds, Jr. also directed the assignment of Sanders' premises lease and two customer production contracts of Sanders Manufacturing—El Paso, to the newly formed Foster Mold & Die, Inc. The attorney arranged that fifty percent of the shares of Foster Mold & Die, Inc. were to be issued to Foster, and the other half to Sanders. Sanders testified that he never consented to the incorporation of Sanders Manufacturing—El Paso and certainly never agreed to give Foster fifty percent of his business. The attorney wrote Sanders on October 21, 1988, informing him that Sanders Manufacturing—El Paso had been incorporated as Foster Mold & Die, Inc. and notified him that he would be asked to comply with other provisions of the original agreement. As expected, the Attorney's letter angered Sanders. Upon discovering that his business had been incorporated without his knowledge or consent, Sanders demanded that his equipment be returned to him. In response, Foster was directed by the attorney to change the locks on the door to the premises, thus preventing Sanders from taking the equipment. The "lock-out" was accomplished with the assistance of the Edmundses. A letter was prepared by the attorney, addressed to "any Peace officer who would be called" requesting that any law enforcement official called to the business was not to remove any equipment from the premises because of the dispute between the parties. A copy of the letter was given to Foster and to the front office at Gateway Business Park. Both Foster and the attorney asked Ted Edmunds to be present at the business when Sanders arrived. On October 24, 1988, Sanders arrived at the business premises and found that the doors were locked. Sanders testified that Ted Edmunds yelled at him "at the top of his lungs" telling Sanders "to get off of his property." Sanders then left the premises. At that time, Sanders had·a

strong suspicion that the Edmunds' involvement was beyond mere landlords but claims he was not certain of the extent of their involvement until such matters came out in their depositions.

In January 1989, Foster filed a lawsuit against Sanders seeking only specific performance regarding the original agreement with Sanders. At his deposition in April 1989, Sanders indicated that he would make no more capital contributions to the business, that he wanted his equipment returned, and that he wanted no further relationship with Foster. Sanders retained his own attorney who demanded that the equipment be returned within thirty days. After Sanders' deposition, the Edmunds' attorney proposed that the parties enter into a buy-sell agreement. On June 6, 1989, the Edmunds' attorney was advised that Sanders would not enter into a buy-sell agreement, and requested that the equipment be returned "as soon as is practical and reasonable taking into consideration Mr. Foster's needs . . . ."

On June 26, 1989, the Edmundses incorporated Foster Mold, Inc. Both Foster Mold & Die, Inc. and Foster Mold, Inc. continued at the same location of Sanders Manufacturing—El Paso, with the identical employees, identical assets, identical inventory, identical equipment, and the identical customers. This new corporation, Foster Mold, was owned equally by Foster, his wife Libby, Ed Edmunds, Jr., and Ted Edmunds. The four of them were each appointed officers and directors, with Foster as president. Sanders had no interest in Foster Mold, Inc. In May 1991, the Edmundses acquired the Fosters' interest in Foster Mold, Inc. By June 30, 1991, Foster Mold, Inc. reported sales in excess of $1,000,000.

*The Jury Findings*

The case went to trial on Sanders' claims against Ed Edmunds, Jr., Ted Edmunds, and Foster Mold, Inc. for "conversion of business," temporary conversion of equipment, tortious interference with his prospective contracts with customers, and tortious interference by the Appellants with his contract with Foster. The jury found that all Appellants had converted Sanders' business as well as his equipment on October 20, 1988, and had tortiously interfered with Sanders prospective customer contracts and with his contract with Foster. The jury awarded $13,500 for the temporary conversion of equipment and $58,156 for conversion of the business. The jury assessed $432,206 as Sanders' lost profits, proximately caused by interference with prospective contracts, and found that Sanders suffered no damages resulting from tortious interference with his contract with Foster. The jury further found that all of the Appellants had committed both conversion torts with malice, and imposed exemplary damages in the second phase of the trial totaling $1,050,-000. Appellants now bring this appeal.

## II. *DISCUSSION*

Appellants attack the trial court's judgment with forty-four points of error. Several of these points challenge the legal and factual sufficiency of the evidence to support the various jury findings.

### 1. Standards of Review

#### a. Legal Insufficiency

When considering a "no evidence" legal insufficiency point, we consider only the evidence that tends to support the jury's findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *Texas Tech Univ. Health Sciences Ctr. v. Apodaca*, 876 S.W.2d 402 (Tex.App.—El Paso 1994, writ denied). If there is more than a scintilla of evidence to support the questioned finding, the "no evidence" point fails. *Tseo v. Midland Am. Bank*, 893 S.W.2d 23, 25 (Tex.App.—El Paso 1994, writ denied); *Hallmark v. Hand*, 885 S.W.2d 471, 474 (Tex.App.—El Paso 1994, writ denied).

In reviewing "no evidence," either in the context of evidence in support of a jury finding or proper submission of a jury question, we consider only the evidence and inferences that tend to support the finding, and disregard all evidence and inferences to the contrary. *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex.1992); *Neese v. Dietz*, 845 S.W.2d 311, 312 (Tex. App.—Houston [1st Dist.] 1992, writ denied). If there is more than a scintilla of probative evidence to support the finding, a no evidence challenge fails. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987); *Mai v. Mai*, 853 S.W.2d 615, 618 (Tex. App.—Houston [1st Dist.] 1993, no writ). When the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of the vital fact, it amounts to more than a scintilla of evidence, and the no evidence challenge must be overruled. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983).

### b. Factual Insufficiency

The test for factual insufficiency points is set forth in *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). A factual insufficiency point requires us to examine all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 244 S.W.2d at 661; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Beall v. Ditmore*, 867 S.W.2d 791, 795 (Tex.App.—El Paso 1993, writ denied). The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force to support the finding, it must be sustained. *Carrasco v. Goatcher*, 623 S.W.2d 769, 772 (Tex.App.—El Paso 1981, no writ). It is not within the province of this Court to interfere with the jury's resolution of conflicts in the evidence, or to pass on the weight or credibility of the witnesses' testimony. *Southwest Airlines Co. v. Jaeger*, 867 S.W.2d 824, 829–30 (Tex. App.—El Paso 1993, writ denied). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Oechsner v. Ameritrust Texas, N.A.*, 840 S.W.2d 131, 136 (Tex. App.—El Paso 1992, writ denied).

### 2. Sufficiency of the Evidence: Conversion

In Points of Error Nos. One through Six, the Appellants contend that the trial court erred in overruling their motion for judgment n.o.v., their motion for directed verdict, their motion for new trial, and their objections to the submission of questions numbers one, two, five, and six to the jury because there is legally and factually insufficient evidence that the Edmundses and Foster Mold, Inc. converted Bill Sanders' business and equipment.

The jury charge requested a determination of whether the business and its equipment was converted by Ed Edmunds, Jr., Ted Edmunds, and Foster Mold, Inc. The jury in the instant case found each of the above Appellants liable on both claims of conversion and assessed damages accordingly.

Conversion is the wrongful exercise of dominion and control over another's property in denial of, or inconsistent with, his rights. *Barraza v. Law Offices of Smith & Gopin*, 918 S.W.2d 608, 611 (Tex. App.—El Paso 1996, no writ). A plaintiff must prove that at the time of the conversion, he or she was the owner of the property, had legal possession of it, or was entitled to possession. *Whitaker v. Bank of El Paso*, 850 S.W.2d 757, 760 (Tex. App.—El Paso 1993, no writ); *Lone Star Beer, Inc. v. First Nat'l Bank of Odessa*, 468 S.W.2d 930, 933–34 (Tex.Civ.App.—El Paso 1971, writ ref'd n.r.e.). Ordinarily, the plaintiff must establish that he demanded return of the property, and that the defendant refused to return it. *Whitaker*, 850 S.W.2d at 760. Demand and refusal are not necessary, however, when the possessor's acts manifest a clear repudiation of the plaintiff's rights. *Id.* While an absolute refusal to transfer possession

to one entitled to it generally constitutes conversion, a refusal to deliver property on request may be justified in order to investigate the rights of the parties, and no conversion results if such refusal is made in good faith to resolve a doubtful matter. *Id.* Any reasons for refusing to turn over the property which are not mentioned at the time of the refusal are lost and may not be raised later. *Id.* Exemplary damages are available if the unlawful act warranting actual damages was of a wanton or malicious nature. *George Thomas Homes, Inc. v. Southwest Tension Sys., Inc.,* 763 S.W.2d 797, 800 (Tex.App.—El Paso 1988, no writ). Implied or legal malice exists when wrongful conduct is intentional and without just cause or excuse. *Id.*

■ It is significant that the jury found the Edmundses and Foster Mold, Inc. converted Sanders' business and his equipment *on October 20, 1988.* Importantly, no party challenges the jury's finding regarding the date the conversion took place. From our examination of the record, we find there is no evidence which could support a finding that any of the defendants exercised dominion and control over Sanders's business or equipment as of October 20, 1988.

■ First, the record established that Foster Mold, Inc. did not exist until June 26, 1989. Normally, a corporation which has no legal existence at the time of an incident cannot be liable for that incident. *Bailey v. Vanscot Concrete Co.,* 894 S.W.2d 757, 759 (Tex.1995); *Henson v. Estate of Crow,* 734 S.W.2d 648, 649 (Tex. 1987). A party who has no dealings with property on or before the date of an alleged conversion cannot be held liable for a conversion on that date. *See Geders v. Aircraft Engine & Accessory Co.,* 599 S.W.2d 646, 650 (Tex.Civ.App.—Dallas 1980, no writ).

Similarly, the evidence in this case cannot support the jury's finding that the Edmundses converted Sanders's business or equipment on October 20, 1988. There is some evidence that the Edmundses may have had designs on the business. Foster testified that the Edmundses wanted the business for themselves and that they simply took Sanders' business away from him. Libby Foster testified that the Edmundses saw that the Fosters had a "good thing" and wanted to enter into a partnership with them. Both Fosters testified that they were manipulated and pressured by the Edmundses. The evidence also shows that at least from June 1988, Ed Edmunds, Jr. had substantial influence over Foster's business decisions. It was Ed Edmunds Jr. who suggested the October 20, 1988 incorporation to Foster Mold and Die, Inc., advised Foster to transfer the business assets to the new corporation, and helped Foster accomplish the "lock-out." Further, sometime in the summer of 1988 when Foster was in need of outside investment, the Edmundses approached Foster with the idea that they would invest in the business. Foster testified that the Edmundses brought up the idea and never sent him to talk to any other potential investor. Both Foster Mold & Die, Inc. and the eventual incarnation as Foster Mold, Inc. continued at the same location of Sanders Manufacturing—El Paso, with the same employees, same assets, same inventory, same equipment, and same customers. Foster Mold, Inc. was owned equally by Foster, his wife, Ed Edmunds, Jr., and Ted Edmunds. The four of them were each appointed officers and directors, with Foster as president. Sanders was cut out completely. In May of 1991, the Edmundses acquired the Foster's interest in Foster Mold, Inc. and became the only two shareholders. Foster left the company shortly thereafter.

Although this evidence may suggest some form of conspiracy to usurp the business on the part of the Edmundses, or the Edmundses' use of Foster as an agent to accomplish a take-over, none of the evidence establishes that either Edmunds exercised dominion and control over Sanders's business or equipment on October 20, 1988, the day Foster Mold and Die was

incorporated and the day chosen by the jury as the date of conversion. The Edmundses had no ownership in Foster Mold and Die, nor were they officers or directors of it. It was not until Foster Mold, Inc. was incorporated on June 26, 1989 that the Edmundses asserted any ownership of the business or equipment. Even the Edmunds' participation in the "lock-out," itself of minor value as evidence of dominion and control due to the Edmundses' position as land-lords to the business, occurred days after the October 20, 1988 date set by the jury. In the absence of any conspiracy, agency, or other vicarious liability issue or instruction submitted to the jury, there is simply no evidence sufficient to link the Edmundses to a conversion of Sanders's equipment and business on October 20, 1988.[2]

Accordingly, we sustain points of error one through six. Our disposition of these points makes it unnecessary for us to address points ten and eleven relating to damages for conversion, thirteen through eighteen and thirty-three relating to the jury's malice findings, and twenty-eight, twenty-nine and thirty-four relating to alleged error in the trial court's submission of the conversion issue to the jury.

### 3. Sufficiency of the Evidence: Tortious Interference Damages

■ In their twelfth point of error, the Appellants contend that the evidence was legally insufficient to support the jury's award of $432,206 in lost profit damages for Sanders's tortious interference claims. With the familiar legal sufficiency standard of review we recounted earlier in this opinion in mind, we note that our legal sufficiency review in this instance requires us to determine the sufficiency of lost prof-

it evidence since Sanders requested tortious interference damages based on lost profit. Recovery for lost profits does not require that the loss be susceptible of exact calculation, however, the injured party must do more than show that they suffered some lost profits. The amount of the loss must be shown by competent evidence with reasonable certainty. *Holt Atherton Industries, Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992). What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *Id.* A plaintiff must demonstrate one complete calculation of lost profits. *Holt Atherton Industries*, 835 S.W.2d at 85. Moreover, to recover lost profits, a party must show either a history of profitability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty. The correct measure of damages for lost profits is net profits. *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex.App.—Dallas 1988) *writ denied per curiam*, 778 S.W.2d 865 (Tex.1989).

■ In this case, Sanders based his lost profits evidence neither on a history of profitability nor on a showing of future contracts. Moreover, Sanders's evidence was not based on a calculation of net profits. Instead, Sanders's expert based his lost profit calculation on average percentage profits for similar businesses as shown in the Robert Morris and Associates and Prentice Hall manuals. These manuals, the expert explained, provide bench marks for profit a company should return expressed as a percentage of the value of the company's assets. The manuals base their

---

**2.** Sanders's briefing and the post-trial amendment to his pleadings suggest an intent to assert a "concert of action" theory as set forth in Section 876 of the Restatement (Second) of Torts. *See* Restatement (Second) Of Torts § 876 (1977). The Texas Supreme Court, however, has not recognized this theory of

recovery. *See Juhl v. Airington*, 936 S.W.2d 640, 643 (Tex.1996). Moreover, we believe the theory, even if recognized, would require a jury issue or instruction on responsibility pursuant to the actor's concert of action with the actual wrongdoer. No such instruction was given or requested in this case.

calculations on financial information provided by a large number of subscriber companies. Based on the success of Sanders's tool and die business in Florida, the expert assumed that had Sanders continued in the El Paso business, it would have realized a profits in the top 25% of similar business as reported in the manuals. The expert multiplied the percentage suggested for top performing businesses in the manuals by the total assets of the El Paso business in order to arrive at a projected profit for a hypothetical business headed by Sanders for each year from 1990 through 1993. These calculations yielded a total projected profit of $540, 413. Since according to Sanders's side of the story Sanders should have owned one half of the business, the expert opined that Sanders lost approximately $270,000 in profit.

Under cross examination, the expert readily admitted that his calculation was a "yardstick" comparison measurement to comparable companies in comparable industries, not a projection of lost net profits based on projected revenues minus projected operating expenses for this particular business. Although the expert's calculation may have been a valid profitability projection from an accounting prospective, it was not founded on a history of the business's profitability or on the existence of future contracts as required to show lost profit damages in the context of a lawsuit. Accordingly, there is no evidence of the correct legal measure of damages found in this record. We therefore find the evidence legally insufficient to support the jury's damage finding and we sustain the Appellants' twelfth point of error. Our disposition of this point makes it unnecessary to address the Appellants' points seven through nine, nineteen through twenty-one, and thirty through thirty-two relating to Sanders's tortious interference recovery as well as point twenty-seven relating to admission of the expert damages testimony.

## EXEMPLARY DAMAGES
## POINTS OF ERROR

The Appellants raise various challenges to the exemplary damages awarded against them with eleven separate points of error. We find that our disposition of the Appellants' first through sixth and twelfth points make it unnecessary for us to address these points. It is well settled that recovery of actual damages is prerequisite to receipt of exemplary damages. *See, e.g., Nabours v. Longview Savings and Loan Ass'n,* 700 S.W.2d 901, 903 (Tex.1985); *Martin v. Texas Dental Plans, Inc.,* 948 S.W.2d 799, 804 (Tex. App.—San Antonio 1997, writ denied); *see also* Tex. Civ. Prac. & Rem.Code Ann. § 41.004 (Vernon 1997) (providing that "[e]xemplary damages may be awarded only if damages other than nominal damages are awarded"). Since the jury found Sanders suffered no damages resulting from any tortious interference with his business relationship with Foster, and we have determined that Sanders was not entitled to recover damages on his other claims, we find that Sanders is not entitled to recover exemplary damages. We therefore need not address the appellees' points twenty-two through twenty-four, twenty-six, thirty-five through thirty-seven, and forty-one through forty-four regarding exemplary damages.

## POST TRIAL AMENDMENTS TO
## SANDERS'S PETITION

Appellants' Point of Error No. Thirty-eight alleges that the trial court erred in permitting Sanders to amend his petition after the verdict to assert a new theory of recovery. Appellants aver that the court erred in permitting Sanders to file his Fifth Amended Petition with leave of court, post-verdict, because Sanders was attempting to assert "some sort of vicarious liability theory for the actions of Foster." We note, however, that no such theory was presented to the jury either in the form of a question or instruction. Our finding under the Appellants' first through

sixth points therefore renders this point moot and we overrule it.

## CONCLUSION

Having sustained the Appellants' points one through six and twelve, we find the evidence legally insufficient to support the jury's verdict. We therefore reverse the judgment of the trial court and render judgment that Sanders take nothing on his claims. As already stated, our disposition of these points makes further discussion of points seven through twenty-four and twenty-six through forty-four unnecessary. Additionally, our disposition of points one through six and twelve makes it unnecessary to reach Appellants' point twenty-five relating to multiple recovery for a single injury and points thirty-nine and forty relating to the trial court's assessment of pre-judgment interest.