**FIRST NATIONAL BANK OF SEMINOLE, TEXAS,**
Appellant,

v.

Sam P. HOOPER, Mary Beth Hooper, and Hooper & Sons Investment Company, Inc., Appellees.

No. 08-99-00492-CV.

Court of Appeals of Texas, El Paso.

May 17, 2001.

Rehearing Overruled June 13, 2001.

Ken Slavin, Kemp Smith, P.C., El Paso, for Appellant.

Frank D. Chandler, Quinn Clinton Chandler, Dallas, for Appellees.

Before Panel No. 1: LARSEN, McCLURE, and CHEW, JJ.

## OPINION

LARSEN, Justice.

In this fraudulent transfer case, First National Bank of Seminole appeals a $700,000 judgment for Sam P. Hooper, Mary Beth Hooper, and Hooper & Sons Investment Company, Inc. We affirm.

## FACTS

This case involves a dispute between the Hoopers, judgment creditors of Ernest W. Thornton, and First National Bank of Seminole, a lending creditor of Thornton. Thornton, although a named defendant, did not appear at trial and is not a party to this appeal.

Between January 1990 and March 1992, the Bank loaned Thornton over $400,000 to purchase and operate the Owego Gathering System. Owego is a gas delivery complex consisting of pipe, booster stations, contracts with the plant receiving the gas, easements, rights-of-way, and equipment. To secure his loans, Thornton originally gave the Bank a UCC–1, pledging security interests in Owego's accounts, contract rights, chattel paper, general intangibles, pipe, and certain other listed equipment.

On March 30, 1993, the Hoopers obtained a fraud judgment against Thornton for almost a million dollars. About two weeks later, on April 15, the Bank had Thornton execute a deed of trust for the Owego System, backdated to January 1990. On April 30, 1993, the Hoopers abstracted their judgment against Thornton. The Bank began foreclosure proceedings against Thornton within weeks after execution of the deed of trust. On June 1, 1993, the Bank bought the system for $247,900 at a foreclosure sale. Almost a year later, the Bank conducted a public sale of the contract rights and equipment contained in Thornton's security agreement, which it purchased for $20,000.

The Hoopers filed suit against the Bank seeking to set aside the foreclosure sale and alleging that the Bank's deed of trust lien was a fraudulent transfer. The Bank answered asserting that the deed of trust was taken for a reasonable equivalent value and in good faith, without any intent to hinder, delay, or defraud any creditor, including the Hoopers.

The case was tried to a jury, which found that: (1) Thornton intended to hinder, delay, or defraud the Hoopers in their efforts to collect their judgment; (2) the deed of trust was not given for reasonably equivalent value; and (3) Thornton was insolvent at the time of the transfer. The jury failed to find that the Bank engaged in any improper conduct. The jury valued the Owego System at $700,000. Based on these findings, the trial court entered judgment that the Hoopers recover $700,000 plus interest from the Bank. It is from this judgment that the Bank now appeals.

### Good Faith and Reasonably Equivalent Value

In its first issue, the Bank asserts that its deed of trust lien was not voidable because it acquired the lien from Thornton in good faith and for reasonably equivalent value. The Bank contends this was established as a matter of law, contrary to the jury's findings.

The law governing the Hoopers' claim is found in the Texas Uniform Fraudulent Transfer Act.[1] TUFTA provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim

1. TEX.BUS. & COMM.CODE ANN. § 24.001 (Vernon 1987).

arose within a reasonable time before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.[2]

Section 24.006, which concerns fraudulent transfers as to present creditors only, states that

A transfer made ... by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made ... if the debtor made the transfer ... without receiving a reasonably equivalent value in exchange for the transfer ... and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer.... [3]

Section 24.009(a) sets out defenses, liability, and protection available to the transferee:

(a) A transfer or obligation is not voidable under Section 24.005(a)(1) of this code against a person who took in good faith and for a reasonably equivalent value.... [4]

## STANDARD OF REVIEW

■■■ In a fraudulent transfer case where the suit is brought by creditors (here, the Hoopers) against a party (here, the Bank) which defends by claiming it was a good faith purchaser for reasonably equivalent value, the burden is initially on the creditor to show fraudulent intent of the transferor (Thornton). When such intent is shown, the purchaser must show that reasonable value was paid and that it took in good faith.[5] Finally, for the creditor to prevail, it must prove that at the time of transfer, the purchaser had notice of fraud.[6] When an attack is made on a conveyance based value, the burden of showing the debtor's insolvency at the time of the conveyance is on the attacking creditor (the Hoopers).[7]

■■ The Bank had the burden of proving its affirmative defense that it took in good faith and for reasonably equivalent value. Because the jury found against it on those issues, and it challenges that finding by claiming it proved its defense as a matter of law, it must demonstrate on appeal that the evidence conclusively established all vital facts in support of this issue.[8] In reviewing this "matter of law"

2. Tex.Bus. & Comm.Code Ann. § 24.005(a) (Vernon 1987).

3. Tex.Bus. & Comm.Code Ann. § 24.006(a) (Vernon 1987).

4. Tex.Bus. & Comm.Code Ann. § 24.009(a) (Vernon 1987).

5. See id. (providing defense if transfer was made in good faith and for reasonably equivalent value).

6. 17 Tex.Jur. 3d Creditors' Rights and Remedies § 599 (1982); see Rucker v. Steelman, 619 S.W.2d 5, 7 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.).

7. 17 Tex.Jur. 3d Creditors' Rights and Remedies § 601 (1982).

8. See 24 St. Mary's L.J. 1045, 1135 (1993).

challenge, we employ a two-part test: we must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary, and if there is no evidence to support the finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law.[9] If the contrary proposition is established conclusively by the evidence, only then will the point be sustained.[10]

### Insolvency

■ TUFTA provides this definitions of insolvency:

(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

(b) A debtor who is generally not able to pay the debtor's debts as they become due is presumed to be insolvent.[11]

The jury in this case was instructed accordingly. With regard to Thornton's insolvency, Robert M. Cosby, the Bank's executive vice-president, testified that the Bank knew by February 1990 that Thornton was having financial difficulties, less than one month after the Bank loaned him $300,000. Thornton's financial statement at that time indicated he was liable on one-half a note to Commercial State Bank for over two million dollars, and that his half was in default. In July 1990, Thornton filed another financial statement indicating, in the handwriting of the Bank's president, that the Commercial State Bank note was $125,000 in arrears. In August 1990, the Bank loaned Thornton $40,000, which loan it extended in November 1990. The reason given for the extension was "waiting sale of Owego for one million dollars."

The note was extended again in March 1991. Despite this, the Bank loaned Thornton another $50,000 in March 1991, extended in June 1991. The original $300,000 loan was extended in August 1991. On the same day, the Bank made Thornton yet another loan of $25,000. Cosby testified to at least nine more loan extensions given Thornton. Between December 1991 and March 1993, Thornton made no payments on the $300,000 principal of the original loan. In September 1992, the Bank restructured all Thornton's loans because he was not servicing the debt. Nevertheless, in November 1992, the Bank loaned Thornton another $6,000.

### Reasonably equivalent value

■ Under TUFTA "reasonably equivalent value":

includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have wilfully sold the assets in an arms length transaction.[12]

The jury in this case was instructed accordingly. Here, the Bank contends the transfer was the foreclosure sale, while the Hoopers assert the transfer was Thornton's execution of the Owego System deed of trust to the Bank.

The Bank relies upon TUFTA's language that:

a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale ... for the acquisition or disposition of the interest of the debtor

---

9. *Id.*

10. *Id.*

11. TEX.BUS. & COMM.CODE ANN. § 24.003 (Vernon 1987).

12. TEX.BUS. & COMM.CODE ANN. § 24.004(d) (Vernon 1987).

upon default under a ... deed of trust[ ] or security agreement.[13]

The Bank contends that the correct date for assessing value is that of the foreclosure sale, June 1, 1993, when the Bank bought the Owego Gathering System for $247,900.[14] We note, however, that even if we were to accept this as correct, the Bank itself valued the Owego System at $350,000 during this time.

Conversely, the Hoopers contend the valuation was correctly calculated on the date that Thornton gave the Bank his backdated deed of trust: April 15, 1993. On or near this date, there was evidence that Thornton still owed $202,876.49 on the $300,000 loan, and that the Bank received purchase offers on the Owego System for $700,000. Further, the Hoopers presented evidence that replacement value of the Owego System was between $900,000 and one million dollars.

Under TUFTA, "transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, *and creation of a lien or other encumbrance.*[15] Further:

> a transfer is made with respect to an asset that is real property ... when the transfer is so far perfected that a good faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee;.... [16]

Because the statute clearly provides that a transfer occurs when a lien is created, we find that the operable date for valuation was when Thornton gave the Bank a deed of trust to secure his indebtedness. Moreover, because there was evidence showing a variance in the value of the deed of trust and the value of the system, we find sufficient evidence that the transfer was not made for a reasonably equivalent value. As the Bank has not established reasonably equivalent value as a matter of law, it cannot prevail on its legal insufficiency claim. Issue One is overruled.

### Personal Money Judgments under TUFTA

■ The Bank next asserts that the Hoopers were not entitled to a personal money judgment against the Bank. TUFTA provides that, if the judgment is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as equity may require.[17] Specifically, the Bank contends that, at the time of transfer, the value of its lien exceeded the established value of the system and therefore the asset had no value. It is again the Bank's position that transfer occurred at the time of the foreclosure sale.

Conversely, the Hoopers contend that the Bank, prior to the transfer of the deed of trust, had a valid lien only in the equipment attached to the system in two locations. According to the Hoopers, the uncontroverted evidence further showed that

---

**13.** *See* Tex.Bus. & Comm.Code Ann. § 24.004(b) (Vernon 1987).

**14.** The Bank adds that at the foreclosure sale, no one chose to outbid the Bank's offer of $247,900.

**15.** *See* Tex.Bus. & Comm.Code Ann. § 24.002(12) (Vernon 1987) (emphasis added).

**16.** *See* Tex.Bus. & Comm.Code Ann. § 24.007(1) (Vernon 1987).

**17.** *See* Tex.Bus. & Comm.Code Ann. § 24.009(c) (Vernon 1987).

the equipment secured by the Security Agreement were booster stations that had no value. Because the Bank provided no controverting testimony regarding the value of this equipment, the Hoopers assert that the value of the Bank's "valid lien" did not exceed the value of the asset transferred.

If the facts are undisputed, equitable relief is a question of law for the court, subject to an abuse of discretion standard of review on appeal.[18] If, however, material facts are in dispute, the trial court is required to have the jury resolve those fact issues before deciding whether to grant equitable relief.[19]

When a creditor establishes a fraudulent transfer, Section 24.008 sets forth the remedies available to the creditor subject to the limitations of Section 24.009.[20] The Section 24.008 remedies include an avoidance of the obligation to the extent necessary to satisfy the creditor's claim, an attachment against the asset transferred, or, subject to applicable principles of equity and in accordance with the Texas Rules of Civil Procedure, an injunction against further disposition of the asset transferred, the appointment of a receiver to take charge of the asset transferred, *or any other relief the circumstances may require*.[21] Here, the Hoopers elected to choose the latter equitable remedy.

We begin by noting that the Bank never raised its objection to the Hoopers' election to take a money judgment before the trial court. We will nevertheless examine the merits of this claim. We reiterate, as found above, that the Owego System was transferred, not upon foreclosure sale, but rather when Thornton gave his deed of trust to the Bank. The jury found the value of the Owego System to be $700,000. The Hoopers' expert valued the Owego System at between $900,000 and a million dollars at the time Thornton executed the deed of trust to the Bank. Evidence also showed that at the time the Bank purchased the pipeline at the foreclosure sale, its value had decreased to $247,900. Based on this great loss in the asset's value, the trial court did not abuse its discretion in granting the equitable money judgment as it was the sole meaningful remedy available to make the Hoopers whole.

The Bank argues that although there are no Texas cases specifically construing Section 24.009(c), an appellate court in Washington has held that this uniform provision does not entitle a defrauded creditor to a money judgment against a transferee unless the transferee *knowingly* accepted the property with an intent to assist the debtor in evading the creditor or the equitable principles or equitable principles otherwise compel such relief.[22] Relying on this authority, the Bank notes that the Hoopers offered no evidence and sought no jury finding that the Bank assisted Thornton in evading the Hoopers' judgment or that the Bank had any knowledge of the Hoopers' claim against Thornton. In fact, the jury's answers to Special Issue Numbers 3 and 5 tend to show that the jury did not believe

---

18. *See Crown Constr. Co. v. Huddleston*, 961 S.W.2d 552, 558 (Tex.App.—San Antonio 1997, no writ).

19. *See Casa El Sol–Acapulco v. Fontenot*, 919 S.W.2d 709, 715 (Tex.App.—Houston [14th Dist.] 1996, writ dism'd by agr.).

20. *See* Tex.Bus. & Comm.Code Ann. § 24.008(a) (Vernon 1987).

21. *See* Tex.Bus. & Comm.Code Ann. § 24.008(a) (Vernon 1987) (emphasis added).

22. *See Park Hill Corp. v. Sharp*, 60 Wash.App. 283, 803 P.2d 326, 328 (1991).

that the Bank willingly engaged in any bad conduct regarding the transfer. As the Bank correctly states, however, no Texas cases require that a creditor show "knowing" participation by the transferee to obtain a money judgment. More importantly, the statute does not mention or mandate such a requirement. We decline to adopt the Washington court's reasoning.

Issue Two is overruled.

### Legal and Factual Insufficiency

In its third issue, the Bank asserts that there was legally and factually insufficient evidence to support the jury's award of $700,000.

Because we have already answered the question of legal sufficiency adversely to the Bank in Issue One above, we now address only the factual sufficiency challenge. As this Court stated in *Edmunds v. Sanders*,[23]

A factual insufficiency point requires us to examine all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force to support the finding, it must be sustained. It is not within the province of this Court to interfere with the jury's resolution of conflicts in the evidence, or to pass on the weight or credibility of the witnesses' testimony. Where there is conflicting evidence, the jury's verdict

on such matters is generally regarded as conclusive.[24]

Not surprisingly, the Bank once again values the asset at the time of foreclosure, rather than when Thornton executed the deed of trust in April 1993. The Bank again urges that because the amount totaling Thornton's indebtedness to the Bank totaled $320,000 at the time the deed of trust was signed and because the Bank purchased the property at the foreclosure sale for $247,900, the value of the property transferred was zero because the term "asset" excludes the amount of the Bank's lien. The Bank also contends that despite the several letters from potential buyers in April 1993, none of these possible purchasers bought the system, and none of them outbid the Bank at the foreclosure sale. Stated differently, there was no evidence of any buyers willing to unconditionally pay more than $247,900 for the system.

The Bank adds that Thornton bought the system in January 1990 for $250,000, and the Hoopers' expert testified that the pipeline had the same value in 1993 that it did in 1990. The expert's opinion that the system was valued at between $900,000 and one million dollars is based on its replacement value. According to the Bank, however, replacement value is recoverable only if the property has no market value.[25]

Conversely, the Hoopers assert that the only evidence the Bank presented to show the value of the system was the testimony of the Bank's officers as to what value they assigned to the pipeline according to (1) bank records of September 1993, five months after Thornton signed the Deed of

23. 2 S.W.3d 697 (Tex.App.—El Paso 1999, pet. denied).

24. *See Edmunds*, 2 S.W.3d at 703 (citations omitted).

25. *See Flores v. Rizik*, 683 S.W.2d 112, 115 (Tex.App.—San Antonio 1984, no writ); *Shaw Tank Cleaning Co., Inc. v. Texas Pipeline Co.*, 442 S.W.2d 851, 854–55 (Tex.Civ.App.—Amarillo 1969, writ ref'd n.r.e.); *Smith v. Dye*, 294 S.W.2d 452, 465 (Tex.Civ.App.—Galveston 1956, no writ).

Trust to secure his indebtedness, and (2) the amount paid at the foreclosure sale. The Bank presented no expert testimony during trial as to the value of the pipeline, nor is there any evidence that the Bank engaged in an independent appraisal of the pipeline's value.

Further, the Hoopers presented evidence that in April 1993, there were letters sent by two potential buyers to Owego Gathering Systems concerning a possible sale of the system. In a letter dated April 26, 1993, one potential buyer states that the purchase price for the system would be $700,000. Additionally, as noted above, the Hoopers presented expert testimony that the value of the system was between $900,000 and one million dollars.

In reviewing all the evidence under the guiding principles of a factual insufficiency standard of review, we cannot say that the jury's findings were against the great weight and preponderance of the evidence. Issue Three is overruled.

### Court's Refusal to Submit "Asset" Definition to the Jury

In its fourth issue, the Bank asserts that the trial court erred in refusing to submit the definition of "asset" to the jury, and that such error caused the rendition of an improper verdict. Specifically, the Bank contends that under TUFTA, the term "asset" has a particular meaning apart from common usage; that is, an "asset" means property of a debtor, but the term does not include property to the extent it is encumbered by a valid lien.[26] Without this definition, and in light of the common meaning of "asset," the Bank argues that the jury failed to exclude the value of the Bank's lien when it determined the value of the system.

The trial court must submit questions and instructions necessary to enable the jury to reach a verdict.[27] In implementing this rule, trial courts have wide discretion,[28] and we will not reverse based on the trial court's refusal to submit a requested instruction unless there is a clear abuse of discretion.[29] The standard of review for a trial court's instruction to the jury is that an error on failing to instruct probably caused the rendition of an improper judgment.[30]

The flaw in the Bank's argument here is, again, that the pipeline was not encumbered by a valid lien prior to the transfer, which occurred when Thornton executed his deed of trust. Before that time, the only lien that the Bank held was on assets described in the UCC–1 Security Agreement. Evidence showed that the Bank's prior security interest in this equipment had little or no value. The Bank itself purchased all the UCC–1 assets for $20,000. Thus, giving the requested instruction would have had little or no effect on the jury's calculation of the system's value or contributed to the rendition of an improper judgment. Failure to give the

**26.** *See* Tex.Bus. & Comm.Code Ann. § 24.002(2)(A) (Vernon 1987).

**27.** *See S.H. v. National Convenience Stores, Inc.,* 936 S.W.2d 406, 408 (Tex.App.—Houston [1st Dist.] 1996, no writ) (citing Tex. R.Civ.P. 277).

**28.** *See Harris County v. Dillard,* 841 S.W.2d 552, 555 (Tex.App.—Houston [1st Dist.] 1992), *overruled on other grounds,* 883 S.W.2d 166, 168 (Tex.1994).

**29.** *See National Convenience Stores,* 936 S.W.2d at 408.

**30.** *See Dillard,* 841 S.W.2d at 555 (applying former Tex.R.App.P. 81(b)(1)); *see also Thrift v. Hubbard,* 974 S.W.2d 70, 82 (Tex.App.—San Antonio 1998, pet. denied) (applying Tex. R.App.P. 44.1(a), formerly Tex.R.App.P. 81(b)(1), to jury submission issue).

instruction was not error. Issue Four is overruled.

### CONCLUSION

The judgment of the trial court is affirmed.