COURT OF APPEALS









COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS

 




 
 
  
 JOHN BIGGAR,
  
                             Appellant,
  
 v.
  
 ROBERT C. PALMER,
  
                             Appellee.
 
 
  
 '
  
 '
  
 '
  
 '
  
 '
 
 
  
 No. 08-01-00468-CV
  
 Appeal from the
  
 161st District Court
  
 of Ector County, Texas
  
 (TC# B-93,999)
 
 




 

MEMORANDUM OPINION

 

This appeal arises from a judgment in
favor of a minority shareholder in a shareholder=s derivative suit.  The majority shareholder raises three issues
on appeal:  (1) the evidence is legally
and factually insufficient to support the jury=s finding that he received $1,500,000
in excess compensation; (2) the trial court erred by admitting evidence
regarding prior litigation between the parties; and (3) the trial court erred
in awarding attorney=s fees.  We affirm.

Factual Background








Robert C. Palmer purchased Avalon
Vocational-Technical Institute in 1986 for $50,000.  John Biggar
contacted Palmer in 1988, seeking to purchase Avalon.  Palmer and Biggar
entered into a contract for sale whereby Biggar
agreed to give Palmer $50,000 and a $25,000 promissory note in exchange for a
90 percent interest in Avalon.  The
contract also provided that Avalon would pay Palmer a consulting fee of $2,200
a month for thirty-six months.  Palmer
testified that the $2,200 consulting fee was actually part of the purchase
price of the 90 percent interest.  He
claimed that Biggar wanted to structure the deal this
way so that part of the purchase price would be tax deductible.  Palmer stated that he was not obligated to
provide any consulting services to receive his $2,200 monthly fee.  Palmer also stated that the fee was not
intended to be a distribution of profits from Avalon.

Pursuant to the contract for sale, Biggar incorporated Avalon as a ASubchapter S@ corporation.  Biggar also caused
Avalon to purchase or establish several other schools.   Biggar purchased
or established yet other schools for himself and did not bring those schools
into Avalon=s corporate structure.

Shortly after Avalon was
incorporated, Palmer and Biggar decided to change the
school=s location.  To accomplish this objective, they formed
another entity, Brawn Corporation, for the purpose of purchasing a new building
for the school.  Biggar
and Palmer each owned 50 percent of Brawn. 
To finance the building=s purchase, Palmer provided $200,000 in certificates of
deposit as collateral.  Biggar did not contribute any collateral.  Avalon rented the building from Brawn.








Palmer testified that Biggar approached him in 1991 about getting into the oil
business.  Palmer was already in the oil
business.  Palmer told Biggar that Biggar would have to
put up the money to go into the oil business because Palmer had already pledged
his $200,000 in certificates of deposit as collateral for the building.  Biggar would send
checks to Palmer, and Palmer would deposit those checks in Brawn=s account and then purchase oil
property with the money.  Some of the
checks sent by Biggar were drawn from an Avalon bank
account; others were drawn from accounts of other schools that Biggar operated. 
Palmer did not consider the checks from Avalon to be distributions of
profits to him.

The accountant for Palmer and Brawn
testified that she allocated the checks that came from Avalon to Brawn=s paid-in capital account.  Because they were 50/50 shareholders in
Brawn, Biggar and Palmer would have each been
entitled to 50 percent of the paid-in capital account upon the corporation=s liquidation.

Palmer eventually purchased Biggar=s interest in Brawn. 
After Palmer took over Brawn, Avalon stopped making its rental payments
on the building.  Palmer sued Avalon and
got a judgment for $223,220.

Palmer testified that neither he nor Biggar was involved in the day-to-day operations of Avalon.  Biggar hired
someone to run the day-to-day affairs of Avalon and non-Avalon schools.








According to Palmer and his
accountant, the only funds that Palmer ever received from Avalon were his
consulting fees and funds to reimburse him for the income tax he had to pay on
his share of Avalon=s reported profits.  Biggar and Palmer did not reach an agreement about the
amount of compensation, if any, that Biggar would
receive.  At trial, Palmer stated an
opinion about what would have been reasonable compensation for Biggar:

Q:        [D]o
you have an opinion about what a reasonable compensation rate would be for a
director of a school, if you would have been a director?

 

A:        Yes.

 

Q:        Well,
what was that?

 

A:        Well,
my idea was anywhere--I have talked to several schools.  And it is anywhere from $75,000.00 to
$100,000.00, $125,000.00.

 

Q:        Let=s take $100,000.00 as a reasonable compensation for
work Mr. Biggar was doing that you weren=t doing, right?

 

A:        That is correct. 

Biggar testified that Avalon became
profitable once he started running it. 
But by 1992, Avalon began posting losses.  According to Biggar,
the losses were caused not by mismanagement but by changes in government
financial aid programs, which had a negative effect on trade schools throughout
the country.  Biggar
testified that he and his wife reinvested approximately $350,000 in
Avalon.  According to Biggar,
Palmer refused to put any more money into Avalon because he considered it a bad
investment.  By 1995, all the Avalon
schools were closed.








The court appointed Don Washburn, a
certified public accountant, to audit Avalon=s books.  The court instructed Washburn to make several
determinations, including:  (1) the
amount of Avalon funds spent to operate trade schools not owned by Avalon; (2)
the amount of Avalon funds spent for personal expenses of Biggar
and his family; (3) the amount of compensation, wages, earnings, dividends,
bonuses, and salaries paid to Biggar and Biggar=s family by Avalon; and (4) the amount of compensation,
wages, earnings, dividends, bonuses, and salaries paid to Palmer by
Avalon.  Washburn prepared a written
report addressing these issues.

Washburn determined that Avalon=s funds were used for the operation
of trade schools owned solely by Biggar.  Biggar managed the
Avalon school, other schools owned by Avalon, and schools not owned by Avalon
from his Austin office.  Washburn
determined that Avalon paid the salaries of all the employees at the Austin
office, as well as other expenses that benefitted
both Avalon and non-Avalon schools. 
Washburn concluded that the non-Avalon schools did not reimburse Avalon
for some of these expenses.








As for whether Avalon funds were used
for the personal expenses of Biggar and his family,
Washburn determined that Avalon paid over $37,000 on Biggar=s personal credit card bills.  Washburn was able to determine that
approximately $4,300 of this amount was attributable to expenses incurred for
Avalon.  Over $14,000 was attributable to
expenses for non-Avalon schools and personal expenses of Biggar
and his family.   From the records
available to him, Washburn could not determine whether the remaining amount was
attributable to Avalon=s expenses or to expenses of non-Avalon schools, Biggar, or Biggar=s family.  Washburn also noticed that Avalon=s general ledger contained additional
credit card charges of approximately $17,000 for which Biggar
could not provide the supporting bills.  Biggar testified that the credit card bills paid by Avalon
were for legitimate expenses he incurred on behalf of Avalon.

Regarding Biggar=s compensation, Washburn testified
that Biggar was paid as a consultant and that he
received a total of $2,547,148.36 in compensation from Avalon between 1989 and
1993.  In addition to this compensation,
Avalon=s general ledger and 1992 tax return
listed a property and cash distribution to shareholders in the amount of
$477,866.36.  Biggar
would have been entitled to receive 90 percent of this amount, or approximately
$430,000.  Washburn testified that it was
possible Biggar received this money in addition to
the compensation he received in 1992. 
Washburn could not find a check to Biggar for
his portion of the $477,866.36, nor was he able to determine if it was a cash
transaction.  Palmer told Washburn that
he did not know anything about the $477,866.36 distribution of profits and that
he did not receive his 10 percent of that amount.








When he drafted his report, Washburn
did not state an opinion about whether Biggar=s compensation was reasonable or
excessive.  At trial, however, he stated
that he did have an opinion on the matter. 
Over Biggar=s objection, Washburn testified, AWell, as I look at audits and the tax
returns and the net income that was produced from Avalon, the compensation
exceeded that in many years.  So I don=t feel it was reasonable at all the
amount of compensation that was being drawn out.@

Regarding compensation to Biggar=s family, Washburn determined that Biggar=s wife, daughters, and son received a
total of $354,022.81 from 1990 to 1993.

Washburn concluded that Palmer
received a total of $149,640 from Avalon between 1989 and 1993.  This amount included the consulting fees that
Palmer received pursuant to the contract for sale.

Eugene Nini
testified as an expert witness for Biggar.  Biggar retained Nini to determine whether Biggar
received 90 percent of the profit distributions from Avalon and Palmer received
10 percent of those distributions, in accordance with their respective
ownership interests in the corporation.  Nini predicated his analysis on Washburn=s report.

Nini testified that according to IRS
rules and generally accepted accounting principles, money received from an S
Corporation by its owners is classified as one of three things:  (1) It may be a loan; (2) it may be
compensation; or (3) if it is not one of the other two, it must be a
distribution of profits.  Nini characterized the funds that Avalon contributed to
Brawn as profit distributions to Biggar and
Palmer.  He also characterized the
remaining $149,640, including the consulting fees, received by Palmer from
Avalon as profit distributions.  After
adding Palmer=s half of the Brawn funds to
$149,640, Nini concluded that Palmer received total
profit distributions from Avalon of $237,545.








Nini accepted Washburn=s finding that Biggar
received $2,547,148.36 from Avalon.  He
testified that a reasonable salary for running a company the size of Avalon
would be $200,000 a year.  Therefore, to
determine the amount Biggar received in profit
distributions, Nini deducted $1,000,000, which
represented $200,000 in salary for five years (1989-93).  To the remaining amount, he added Biggar=s half of the Brawn funds.  
Nini testified that the resulting
sum--$1,635,053--represented the amount of profit distributions received by Biggar.

Thus, by Nini=s calculations, Biggar
received 87 percent of Avalon=s profit distributions, and Palmer received 13 percent.  Nini also testified
that Biggar operated Avalon in an appropriate and
businesslike manner.

Procedural History

Palmer brought this suit in
1993.  See Biggar
v. Palmer, Nos. 08-97-00511-CV & 08-97-00512-CV, slip op. at 2 (Tex.
App.--El Paso Dec. 9, 1999, no pet.) (not designated
for publication).  Avalon subsequently
filed counterclaims against Palmer.  See
id. at 2-3. 
After rendering judgment in favor of Palmer on the derivative suit, the trial
court severed Avalon=s counterclaims from that suit.  See id. at
3.  On appeal, this Court reversed and
remanded, concluding that the trial court abused its discretion by severing the
counterclaims from the derivative suit.  See
id. at 7.








On remand, only Palmer=s derivative suit was tried; the
counterclaims were nonsuited.  The jury found that Biggar
received $1,500,000 in excess compensation, members of Biggar=s family received $86,000 in excess
compensation, Avalon paid $27,000 in Biggar=s personal expenses, and Avalon paid
$7,500 in expenses for non-Avalon schools. 
The jury also found that Palmer had or would incur reasonable and
necessary attorney=s fees in the amounts of $50,000 for preparation and trial of
the case, $5,000 for an appeal in a court of appeals, $4,000 for responding to
a petition for review, and $3,000 for additional work if a petition for review
is granted.

The court rendered judgment against Biggar in the amount of $1,534,500, plus auditor=s fees in the amount of $14,050, and
pre- and post-judgment interest.[1]  The court also ordered that Palmer recover
attorney=s fees in the amounts found by the
jury from Biggar and Avalon, jointly and severally.

Excess Compensation

Jury question 1A asked the jury
whether Biggar breached his fiduciary duty by A[d]rawing
salary, administrative fees, and administrative wages in excess of a reasonable
compensation for the duties performed.@ 
The jury answered Ayes@ to this question. 
Jury question 2A asked the amount of A[e]xcess
compensation@ Biggar
received.  The jury answered A$1,500,000@ to this question.  In his first issue on appeal, Biggar argues that the evidence is legally and factually
insufficient to support the jury=s finding that he received $1,500,000
in excess compensation.  We disagree.








Legal Sufficiency

To determine whether the evidence is
legally sufficient, we consider all the record evidence in the light most
favorable to the party who prevailed at trial, indulging every reasonable
inference from the evidence in that party=s favor.  Merrell Dow Pharms. v. Havner,
953 S.W.2d 706, 711 (Tex. 1997). 
Evidence is legally insufficient when there is a complete absence of
evidence of a vital fact, the court is barred by rules of law or of evidence
from giving weight to the only evidence offered to prove a vital fact, the
evidence offered to prove a vital fact is no more than a mere scintilla, or the
evidence conclusively establishes the opposite of the vital fact.  Id.

Biggar asserts that expert testimony was
required to establish the amount of any excess compensation, that there is a
complete absence of expert testimony supporting the jury=s finding of $1,500,000 in excess
compensation, and that the only expert testimony on point conclusively
establishes that Biggar=s compensation was not excessive.

According to Washburn=s report, Biggar
received a total of $2,547,148.36 in consulting fees from Avalon between 1989
and 1993.  Although he did not state an
opinion regarding how much of this amount was excessive, he did testify that Biggar=s compensation exceeded the net income produced by Avalon in
many years and that it was therefore unreasonable.








Biggar argues that Washburn=s testimony is insufficient to
support the jury=s finding of $1,500,000 in excess compensation because the
testimony does not give an exact figure, an approximate amount, or even a range
for the excessiveness.  Thus, according
to Biggar, there is a complete absence of evidence on
this vital fact.  Washburn=s testimony, however, was not the
only expert testimony on this issue.

Nini testified that a reasonable salary
for running a company the size of Avalon would be $200,000 a year.  Biggar asserts that
Nini also testified that none of the non-salary
compensation received by Biggar was unreasonable or
excessive.  Biggar
argues that Nini=s testimony therefore conclusively
establishes that Biggar=s compensation was not
excessive.  We disagree with Biggar=s characterization of Nini=s testimony.

As noted above, Nini
accepted Washburn=s finding that Biggar received
$2,547,148.36 from Avalon.  From that
amount, he deducted $1,000,000, which represented $200,000 in salary for five
years.  To the remaining amount, he added
$87,905, which represented Biggar=s share of the funds deposited in
Brawn=s capital account.  Nini testified that
after performing these calculations, he Ac[a]me up with distributions of
profits, dividends, whatever you want to call it in an S Corporation.  Mr. Biggar received
. . . $1,635,053.00.@  According to Nini, the terms Adistribution of profits@ and Adividend@ are synonymous.  But he made clear that Adistribution of profits@ and Acompensation@ are not the same.








From this summary of Nini=s testimony, it is apparent that Nini
believed $1,000,000 was the total amount of compensation that Biggar could have reasonably received between 1989 and
1993.  He characterized the remaining
amount that Biggar received as distributions of
profit.  Contrary to the assertion in
Biggar=s brief, Nini
did not testify that this remaining amount was compensation--reasonable,
excessive, or otherwise.[2]

The jury was asked about the
reasonableness of Biggar=s compensation, not his distributions
of profit.  A jury has discretion to
award damages within the range of evidence presented at trial.  Price Pfister,
Inc. v. Moore & Kimmey, Inc., 48 S.W.3d 341,
352 (Tex. App.--Houston [14th Dist.] 2001, pet. denied); see also
Neiman-Marcus Group v. Dworkin, 919 F.2d 368, 372
(5th Cir. 1990) (AWhile the jury may not pull figures out of a hat, its verdict
does not fail for mere lack of exhaustive or dispositive
evidence so long as a rational basis exists for calculation.@). 
Furthermore, a jury may choose to believe all or part of the testimony
of a witness.  See
Garcia v. Dependable Shell Core Machs., Inc., 783
S.W.2d 246, 248 (Tex. App.--Corpus Christi 1989, no writ); Chase v. Faulk,
297 S.W.2d 341, 344 (Tex. Civ. App.--El Paso 1956,
writ ref=d n.r.e.).








In this case, the jury could have
believed Washburn=s report and testimony, in which Washburn stated that the
entire $2,547,148.36 received by Biggar was described
as consulting fees in Avalon=s records.[3]  The jury also could have believed the
testimony of Biggar=s own expert, Nini,
that $1,000,000 would have been reasonable compensation for Biggar.  The difference between the $2,547,148.36
characterized as compensation by Washburn and the $1,000,000 characterized as reasonable
compensation by Nini is $1,547,148.36.  This figure is remarkably close to the
$1,500,000 in excess compensation found by the jury.  See Neiman-Marcus,
919 F.2d at 372 (upholding damages award of $790,000 because there was evidence
that the damages exceeded $1 million).

We conclude that the testimony of
Washburn and Nini is legally sufficient to support
the jury=s finding that Biggar
received $1,500,000 in excess compensation. 
Because the finding is supported by expert testimony, we need not
address Biggar=s argument that expert testimony is
always required to establish the amount of excess compensation.

Factual Sufficiency








Biggar next argues that the evidence is
factually insufficient to support the jury=s finding of $1,500,000 in excess
compensation.  To determine whether the
evidence is factually sufficient, we must examine all the evidence that
supports and contradicts the finding.  Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Edmunds v.
Sanders, 2 S.W.3d 697, 703 (Tex. App.--El Paso 1999, pet. denied); Hickey
v. Couchman, 797 S.W.2d 103, 109 (Tex.
App.--Corpus Christi 1990, writ denied). 
We must reverse if the evidence supporting the finding is so slight, or
the evidence against it is so strong, that the finding is clearly wrong and
unjust.  Cain, 709
S.W.2d at 176; Hickey, 797 S.W.2d at 109.  When there is conflicting evidence, the jury=s verdict is generally regarded as
conclusive.  Edmunds, 2 S.W.3d at 703.  We
cannot substitute our conclusions for those of the jury, interfere with the
jury=s resolution of conflicts in the
evidence, or pass on the weight or credibility of the evidence.  Id.

In his factual sufficiency challenge,
Biggar focuses exclusively on Palmer=s testimony that $75,000 to $125,000
would have been reasonable compensation for Biggar.  He argues that Palmer=s testimony is insufficient because
it relates only to what would have been reasonable compensation for Palmer,
rather than Biggar. 
He also argues that the testimony is insufficient because Palmer is not
an expert, he lacked personal knowledge of the reasonable compensation, and his
opinion did not have a rational basis.








We find it unnecessary to address
these arguments.  Even without
considering Palmer=s testimony, the record contains ample evidence to support
the jury=s finding that Biggar
received $1,500,000 in excess compensation. 
See In re Marriage of Rutland, 729 S.W.2d 923,
933 (Tex. App.--Dallas 1987, writ ref=d
n.r.e.) (concluding
that the court need not decide whether certain testimony was incompetent
because the evidence was legally and factually sufficient without considering
that testimony).  As noted in our
discussion of legal sufficiency, Biggar=s own expert testified that a total
of $1 million would have been reasonable compensation for Biggar.  The jury also saw and heard evidence that Biggar received $2,547,148.36 from Avalon.  This evidence is not so slight as to make the
jury=s calculation of $1,500,000 in excess
compensation clearly wrong or unjust.  Biggar does not point us to any contrary evidence.  Accordingly, we conclude that the evidence is
factually sufficient to support the jury=s finding.

The first issue is overruled.

Evidence of Prior Judgments and
Previous Trials

In his second issue, Biggar argues that the trial court erred by admitting
evidence of judgments that Biggar had obtained
against Avalon.  He also argues that the
court erred by admitting evidence of the previous trials in this case.[4]  We conclude that any error in this regard has
not been preserved.

The Record

Many references were made throughout
the trial to the previous trials that occurred

in this case.  From our review of the record, it appears
that the first reference to the previous trials was made by Biggar=s counsel while he was cross-examining
Palmer.   The next reference to the
previous trials was also made by Biggar=s counsel, this time while he was
cross-examining Washburn.  Counsel asked,
A[Y]ou
testified in the first trial of two that Mr. Palmer lost on appeal, and that is
why we are back here again?@








The first reference to the prior
judgments occurred during opening statements, when Palmer=s counsel stated, AWe believe that the evidence is going
to show that unknown to Mr. Palmer, that Mr. Biggar
goes down to Austin, Texas, where he lives, and he files a lawsuit of John Biggar against--.@ 
Biggar=s counsel interrupted at this point
to state, A[W]e are going to object to the
introduction of this evidence as a collateral source and collateral--.@ 
The court overruled the objection.  
Palmer=s counsel proceeded to tell the jury
that Biggar filed a lawsuit against Avalon, served
himself as registered agent, and obtained a judgment, all in an effort to
prevent Palmer from recovering on his claims.

Both the prior judgments and the
previous trials were discussed when Palmer=s counsel examined Biggar.  Counsel asked,
AAnd it is true, is it not, sir, that
after this claim was brought by Mr. Palmer, that you went out and sued your own
corporation, didn=t you?@ 
Biggar=s counsel interjected, AYour Honor, again, I need to
object.  This is a collateral attack on a
prior Court=s judgment.@ 
The court instructed counsel to approach the bench, at which time Biggar=s counsel continued:

He is
going to attempt now to make a collateral attack on a judgment that is entitled
to full faith and credit.  The Travis
County judgment is over four years old and no attempt was made to appeal
it.  And this is a . . . behind the door
attack on this judgment and I will object to any further testimony.  

 

The trial court overruled the objection, but granted Biggar a running objection to this line of
questioning.  Palmer=s counsel propounded the question to Biggar again, and Biggar admitted
that he filed the suit and took the judgment against Avalon.  Counsel asked the question again and got the
same answer.








Over Biggar=s collateral attack objection, the
court admitted Palmer=s Exhibit 32, which contains documents related to two suits
filed by Biggar against Avalon.  In the first suit, Biggar
alleged that Avalon owed him $1,429,477 for unpaid compensation and for
payments he made and expenses he incurred on Avalon=s behalf.  The exhibit includes a judgment that states Biggar and Avalon settled this suit and that awards Biggar $1,429,477 pursuant to the parties= agreement.  In the second suit, Biggar
alleged that Avalon, through Palmer=s derivative suit, had obtained a
judgment against him.  Biggar requested a declaratory judgment that his judgment
against Avalon and Avalon=s judgment against him should be setoff.  The exhibit contains a declaratory judgment
granting Biggar=s requested relief.

Later, Palmer=s counsel and Biggar
engaged in the following colloquy:

Q:        Okay.  And you will acknowledge . . . that back in
May of 1996, we had this trial here and that there was a judgment after that
that was against you for getting paid excessive compensation; correct?

 

A:        And the
trial--and the federal appeals court sent it back because it was not right.

 

Q:        They didn=t send it back. 
It didn=t have
anything to do with that.  They said
there was improper severance, didn=t they, sir?

 

At this point, Biggar=s counsel stated:  AI want to object, Your Honor.  Now [Palmer=s counsel] is testifying.@ 
The court overruled the objection, and Palmer=s counsel asked, ABut you understand that, don=t you?@ 
Biggar answered, AI know that we have had two trials
and on both of them I have won, and we are back here for the third time.@








After this exchange, Palmer=s counsel and Biggar
engaged in a lengthy back-and-forth about who won in the trial and appellate
courts and about what the appellate decision said.  At one point, Palmer=s counsel stated, A[W]e talked about you coming . . . in
here to trial court and you lose the two cases. 
Then you went down and that is when . . . you filed this lawsuit down in
Austin.  Served yourself and took a judgment
against the company; isn=t that correct?@ 
No objection was lodged, and Biggar answered AYes.@

When Palmer=s counsel finished questioning Biggar, Biggar=s counsel moved for a mistrial,
stating:

[T]he
court=s allowance of the introduction into evidence of the
judgment taken by Mr. Biggar personally against
Avalon is so prejudicial and so outside the scope of Texas law, . . . that a
mistrial is appropriate in the case.

Clearly what [Palmer=s
counsel] has been allowed to do is make a collateral attack on a judgment that
is entitled to full faith and credit and take a back door approach to this
judgment.  I believe that the evidence on
this has been so prejudicial and so inflammatory to the position of the Defendant,
that the mistrial is the only way to cure this--what I believe is an obvious
disregard for the law in Texas.

 

In his motion for new trial, Biggar argued that the court erred by admitting the
testimony and exhibits regarding the prior judgments.  He asserted, AThere was no jury issue to which this
evidence related.  It acted to inflame
and bias the jury and its admission was calculated to, and probably did result
in a different outcome had it not been admitted.@








Biggar=s Appellate Arguments

On appeal, Biggar
contends that the evidence of the prior judgments and previous trials was
irrelevant.  See Tex. R. Evid.
402.  Alternatively, he argues that if
the evidence was relevant, its probative value was substantially outweighed by
the danger of unfair prejudice.  See
Tex. R. Evid.
403.  Biggar
also argues that it was particularly unfair for the trial court to admit this
evidence because the court sustained Palmer=s objection when Nini
attempted to testify about findings the court had made in the previous trials
and, on the court=s own motion, instructed the jury not to consider findings
made in the previous trials.

Preservation of Error








To preserve error in the admission of
evidence, the complaining party must make a timely objection.  Beall v. Ditmore, 867 S.W.2d 791, 793 (Tex. App.--El Paso 1993,
writ denied); Atlantic Richfield Co. v. Misty Prods., Inc., 820 S.W.2d
414, 421 (Tex. App.--Houston [14th Dist.] 1991, writ denied); see also Tex. R. App. P. 33.1(a)(1); Tex. R. Evid. 103(a)(1).  The party waives the complaint if essentially
the same evidence is presented at another point in the trial without
objection.  Richardson
v. Green, 677 S.W.2d 497, 501 (Tex. 1984); Atlantic Richfield, 820
S.W.2d at 421.  In addition, if
the complaint on appeal is not the same as the objection lodged at trial,
nothing is preserved for review.  Rogers v. Stell, 835 S.W.2d 100,
101 (Tex. 1992); G.T. Mgmt., Inc. v. Gonzalez, 106 S.W.3d 880, 885 (Tex.
App.--Dallas 2003, no pet. h.); Texas Dep=t of Transp.
v. Olson, 980 S.W.2d 890, 898 (Tex. App.--Fort Worth 1998, no pet.).

Prior Judgments

During the trial, Biggar=s only objection to evidence of the
prior judgments was that the evidence amounted to a collateral attack.  Biggar argues that
his collateral attack objections preserved his complaints on appeal that the
evidence was irrelevant and unfairly prejudicial.  He asserts that Athe objection for >collateral attack= pertained to Mr. Palmer=s strategy of indirect attack at
trial.  Because the judgment was not
void, it only follows that the evidence proffered in connection with the
indirect attack was irrelevant, prejudicial, and confusing.@

ACollateral attack@ means an attempt to avoid, impeach,
or overturn a judgment in an incidental proceeding not provided by law for the
express purpose of attacking the judgment. 
Black=s Law Dictionary 179 (6th abridged ed.
1991).  Biggar=s trial objections tracked this
definition.  The trial judge could not
reasonably be expected to infer from these plain collateral attack objections
that the evidence was also inadmissible  on the grounds of irrelevance and
unfair prejudice.  Because Biggar=s complaints on appeal do not comport with his objections at
trial, nothing is preserved for review.








Biggar also argues that he raised the
relevance issue by arguing in his motion for new trial that A[t]here was no jury issue to which
this evidence related.@  For reasons of
fairness and judicial economy, a litigant should raise complaints when there is
an opportunity to cure them.  Beall, 867 S.W.2d at 793-94.  This is why timely objections are
required.  Id.  There is no judicially efficient way to cure
a complaint regarding the admission of evidence, when the complaint is raised
for the first time after judgment has been rendered.  Therefore, Biggar=s relevance complaint was untimely.[5]


Biggar also suggests that his mistrial
motion and motion for new trial raised the unfair prejudice issue because they
included words such as Aprejudicial@ and Ainflammatory.@  Assuming for purposes
of argument that use of these words alone was sufficient to apprise the trial
judge of a Rule 403 objection, the objection was
nevertheless untimely for the same reason that the relevance objection was
untimely.

Previous Trials








Biggar complains of three instances when
the jury was informed that he lost the first trials in this case.  In the first instance, Palmer=s counsel said, A[Y]ou will
acknowledge . . . that back in May of 1996, we had this trial here and that
there was a judgment after that that was against you for getting paid excessive
compensation; correct?@  No objection was
lodged here.  Immediately after Biggar answered this question, the second instance
occurred.  Palmer=s counsel said, AThey didn=t send it back.  It didn=t have anything to do with that.  They said there was improper severance, didn=t they, sir?@  Biggar
objected to this question on the ground that Palmer=s counsel was testifying.  The third instance occurred when Palmer=s counsel said, A[W]e talked about you coming . . . in
here to trial court and you lose the two cases. 
Then you went down and that is when . . . you filed this lawsuit down in
Austin.  Served yourself and took a
judgment against the company; isn=t that correct?@ 
No objection was lodged here.

Biggar=s objection that Palmer=s counsel was testifying does not
comport with his argument on appeal that evidence of the previous trials was
irrelevant and unduly prejudicial.  Moreover,
Biggar did not object at all to two of the three
instances about which he complains on appeal. 
For these reasons, his complaints are not preserved for review.  We also note that Biggar=s counsel was the first to inform the jury
about the results of the previous trials when he asked Washburn, A[Y]ou
testified in the first trial of two that Mr. Palmer lost on appeal, and that is
why we are back here again?@

The second issue is overruled.

Attorney=s Fees

In his third and final issue, Biggar argues that the trial court erred in awarding
attorney=s fees to Palmer.  We conclude that any error in this regard is
not preserved.

The Record 









Palmer requested an award of attorney=s fees in his fourth amended
petition.   Specifically, the petition
states, APlaintiff=s successful prosecution of this
action will result in a substantial benefit to Defendant Avalon and, therefore,
Plaintiff is entitled to reimbursement for expenses, including reasonable
attorney=s fees.@ 
The record does not contain any special exceptions to Palmer=s petition.

Question 3 in the court=s charge asked the jury what sum of
money, if any, it found to be the reasonable and necessary attorney=s fees incurred by Palmer in pursuit
of his derivative claims.   Biggar objected to Question 3, arguing:

The
Defendant objects to the submission of Question Number 3 for
reasonable attorney=s fees,
for Mr. Palmer has pursued this case clearly under the Texas Business
Corporation Act.  The law is that a Defendant
who successfully defends a stockholder=s
derivative suit at the time is entitled [to] recovery of reasonable attorney=s fees.  In the
Business Corporation Act this same provision is not found for a Plaintiff who
successfully prosecutes a claim.  And I
do not believe . . . the evidence supports the submission of Question Number 3
on Plaintiff=s attorney=s
fees.  

 

The jury found reasonable and
necessary attorney=s fees of $50,000 for preparation and trial of the case,
$5,000 for an appeal in a court of appeals, $4,000 for responding to a petition
for review, and $3,000 for additional work if a petition for review is
granted.  The court granted a judgment
for these fees against Biggar and Avalon, jointly and
severally.

In his motion for judgment
notwithstanding the verdict, Biggar asserted that the
evidence was legally insufficient Ato sustain the award of attorney=s fees in the judgment in that there
is no finding, or any implied finding supported by the evidence, to show that
this action benefitted the corporation.@ 
In his motion for new trial, he argued that the evidence was factually
insufficient for the same reason.








Biggar=s Appellate Arguments

Biggar argues that the trial court erred in
awarding attorney=s fees for two reasons. 
First, Biggar argues that the fees, if any,
should have been awarded solely against Avalon, rather than against Biggar and Avalon jointly and severally.  Second, Biggar
argues that Palmer waived attorney=s fees by failing to submit a special
jury question, asking whether a substantial benefit had been conferred upon
Avalon.

Common Fund Doctrine

When Palmer commenced this suit, the
Business Corporation Act provided only for a winning defendant to recover
attorney=s fees.  See Act of May 25, 1973, 63rd Leg.,
R.S., ch. 545 ' 37, 1973 Tex. Gen. Laws 1508,
1508-09 (rewritten 1997) (current version at Tex.
Bus. Corp. Act Ann. art. 5.14
(Vernon 2003)).  But a Bar
Committee Comment stated, AA winning plaintiff is entitled to
attorney=s fees and expenses under common law
and equitable principles which the Committee believes requires no codification
in the Act.@ 
See Tex. Bus. Corp. Act Ann. art. 5.14 cmt. (Vernon 2003).[6]








One of the common law and equitable
principles that allows recovery of attorney=s fees is the common fund
doctrine.  See Knebel
v. Capital Nat=l Bank, 518 S.W.2d 795, 799-801 (Tex. 1974).  As applied to a shareholder=s derivative suit, the common fund
doctrine permits a plaintiff to recover attorney=s fees from the corporation if the
plaintiff=s suit secures a substantial benefit
for the corporation.  Martin-Simon v.
Womack, 68 S.W.3d 793, 798 n.3 (Tex. App.--Houston [14th Dist.] 2001, pet.
denied); Bayoud v. Bayoud,
797 S.W.2d 304, 315 (Tex. App.--Dallas 1990, writ denied); Bayliss
v. Cernock, 773 S.W.2d 384, 386-87 (Tex.
App.--Houston [14th Dist.] 1989, writ denied). 
The doctrine is founded upon the principle that a person who preserves
or protects a common fund benefits all those who have an interest in the fund,
that the others benefitted should bear their just
share of the expenses, and that the most equitable way to share the expenses is
to make the expenses a charge on the common fund.  Knebel, 518 S.W.2d at 799.

Joint and Several Award

Based on the above-stated rationale
for the common fund doctrine, Biggar argues that the
court should have only awarded attorney=s fees against Avalon,
and not against him individually.  We can
find nothing in the record to show that Biggar made
this argument to the trial court.








To preserve a complaint for appellate
review, the complaining party must present the complaint to the trial court
with sufficient specificity to make the trial court aware of the
complaint.  Tex. R. App. P. 33.1(a)(1).  Although Biggar
complained of the attorney=s fee award in his motion for judgment notwithstanding the
verdict and motion for new trial, he did not argue, as he does now on appeal,
that the common fund doctrine only allows the award to be rendered against
Avalon.  Accordingly, this complaint is
not preserved.  See Rogers,
835 S.W.2d at 101; see also Luna v. Southern Pac. Transp.
Co., 724 S.W.2d 383, 384 (Tex. 1987) (holding that complaint regarding
judgment=s apportionment of damages was not
preserved because the issue was not raised in a motion for new trial); Wyler Indus. Works, Inc. v. Garcia, 999
S.W.2d 494, 509 (Tex. App.--El Paso 1999, no pet.) (holding that complaint
regarding prejudgment interest was not preserved because it was not urged in
the trial court); Holland v. Hayden, 901 S.W.2d 763, 765 (Tex.
App.--Houston [14th Dist.] 1995, writ denied) (holding that complaint regarding
a double award of attorney=s fees was not preserved because the only complaint made in
the motion for new trial was that the evidence was insufficient to support the
award).

Substantial Benefit

Biggar argues that Palmer waived his right
to an award of attorney=s fees because he failed to request a special question
regarding whether his suit conferred a substantial benefit upon Avalon.  Biggar relies on Bayliss for this argument.  See 773 S.W.2d
at 386-87.








Bayliss was a shareholder=s derivative suit in which the
plaintiffs relied on the common fund doctrine to obtain attorney=s fees.  See id.  The plaintiffs argued that the trial court
erred by sua sponte
disregarding the jury=s finding as to the amount of reasonable attorney=s fees.  The appellate court held that to recover
attorney=s fees under the common fund
doctrine, the plaintiffs were required to request a special question as to
whether a substantial benefit was conferred on the corporation.  Id. at 387.  Because they did not do so, they waived their
right to recover attorney=s fees under that doctrine. 
Id.  The court further held
that the jury=s finding as to reasonable attorney=s fees provided no basis for
recovery.  Id.  Accordingly, the finding was immaterial, and
the trial court did not err by disregarding it. 
Id.

The procedural posture of this case
is different from that of Bayliss.  In Bayliss, the  parties seeking
attorney=s fees were the appellants and they
were complaining of the trial court=s refusal to award the fees.  In this case, the party opposing attorney=s fees is the appellant and he is
complaining of the trial court=s grant of fees.  The
appellant has the burden of preserving complaints for review.    

To preserve error in the jury charge,
a party must make the trial court Aaware of the complaint, timely and
plainly.@ 
State Dep=t of Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 241 (Tex. 1992).  Moreover, Rule 278 of the Texas Rules of
Civil Procedure explains how to preserve error regarding the failure to submit
a question:  

Failure
to submit a question shall not be deemed a ground for reversal of the judgment,
unless its submission, in substantially correct wording, has been requested in
writing and tendered by the party complaining of the judgment; provided,
however, that objection to such failure shall suffice in such respect if the question
is one relied upon by the opposing party.

 

Thus, to preserve his complaint regarding the failure to
submit a question on substantial benefit, Biggar had
to request that the question be submitted or object to the failure to submit
it.








Biggar=s only objections regarding the
charge on attorney=s fees were that the Business Corporation Act did not provide
for a plaintiff to recover attorney=s fees and that the evidence did not
support submitting an attorney=s fee question to the jury. 
Biggar made no mention of the failure to
submit a question on substantial benefit. 
Because he did not raise his appellate complaint in the trial court, the
complaint is not preserved for review.  See
Oechsner v. Ameritrust
Texas, 840 S.W.2d 131, 135 (Tex. App.--El Paso 1992, writ denied) (AA party is confined to the jury
instruction objection made at trial; any variant complaint on appeal is waived.@); see also Pitman v. Lightfoot,
937 S.W.2d 496, 535-36 (Tex. App.--San Antonio 1996, writ denied) (holding that
complaint that attorney=s fees should have been awarded on a pro rata basis was not
preserved because only objection to the charge on this issue related to whether
there was evidence of reasonableness of fee).[7]








Biggar argues that he did not have to
object to the failure to submit the substantial benefit question because Palmer
failed to plead for attorney=s fees under the common fund doctrine.  He asserts that it would be unfair to require
a defendant to make objections to the jury charge regarding every conceivable
theory of recovery when the plaintiff failed to plead these theories
properly.  This argument is not supported
by the record.

Palmer=s petition states, APlaintiff=s successful prosecution of this
action will result in a substantial benefit to Defendant Avalon and, therefore,
Plaintiff is entitled to reimbursement for expenses, including reasonable
attorney=s fees.@ 
This language was sufficient to put Biggar on
notice that Palmer was seeking attorney fees under the theory that his suit
would provide a substantial benefit to Avalon. 
The third issue is overruled.

Conclusion

For the reasons stated herein, Biggar=s issues are overruled, and the judgment of the trial court
is affirmed.

 

SUSAN
LARSEN, Justice

October 16, 2003

 

Before Panel No. 1

Larsen, McClure, and Chew,
JJ.

 











[1]The
court apparently disregarded the jury=s
finding that Biggar=s
family received $86,000 in excess compensation.





[2]In
his appellate brief, Biggar asserts, ADr. Nini . .
. testified that none of Mr. Biggar=s other, non-salary compensation was
unreasonable or excessive.@  For this assertion, he cites defense exhibits
10 and 15 and pages 115 to 135 of volume five of the reporter=s record.  The pages in the reporter=s record contain Nini=s description of how he calculated the
percentages of Avalon=s
profit distributions received by the parties. 
Exhibit 10 is a chart prepared by Nini,
showing Avalon=s profits
and losses.  Exhibit 15 is a chart that
sets out the calculations that Nini described in his
testimony.





[3]We
note that Washburn testified that Biggar may have
received an approximately $430,000 profit distribution in 1992, in addition to
his compensation.  Nini
did not include this money in calculating Biggar=s total profit distributions.





[4]In
the following discussion, the judgments Biggar
obtained against Avalon will be referred to as Athe
prior judgments,@ and the
previous trials in this cause will be referred to as Athe
previous trials.@





[5]Even
if the issue were preserved, the evidence was relevant because Palmer alleged
in his fourth amended petition that Biggar violated
his fiduciary duty by obtaining the judgment.  
See San Antonio Traction Co. v. Higdon, 58 Tex. Civ. App. 83, 86-87, 123 S.W. 732, 734 (Tex. Civ. App. 1909, writ ref=d)
(holding that relevancy is determined by the pleadings, not by the issues
actually submitted to the jury).





[6]The
current version of the Business Corporation Act expressly provides that in a
shareholder=s
derivative suit the court may order the corporation to pay the plaintiff=s attorney=s
fees if the court finds that the suit has resulted in a substantial benefit to
the corporation.  See Tex. Bus. Corp. Act Ann. art.
5.14 (J)(1)(a) (Vernon 2003).





[7]We
also note that Biggar challenged the award of
attorney=s fees in
his motions for judgment notwithstanding the verdict and for new trial on the
ground that the evidence was insufficient to establish that Palmer=s suit benefitted
Avalon.  This argument does not comport
with Biggar=s
appellate complaint that Palmer waived his right to attorney=s fees by failing to request a special
question on substantial benefit.