**LORAM MAINTENANCE OF WAY, INC., Appellant,**

v.

**David IANNI, Appellee.**

No. 08–02–00049–CV.

Court of Appeals of Texas, El Paso.

June 30, 2004.

Cynthia S. Anderson, Kemp Smith, P.C., El Paso, for Appellant.

Gordon Stewart, Calhoun, Vinson & Reaves, L.L.P., El Paso, for Appellee.

Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

## *OPINION*

DAVID WELLINGTON CHEW, Justice.

Appellant Loram Maintenance of Way, Inc. ("Loram") appeals from a judgment in which the jury found in favor of Appellee David Ianni in his negligence suit. On appeal, Loram asserts that, as a matter of law, it owed no duty of care to Mr. Ianni and challenges the legal and factual sufficiency of the evidence to support the jury's findings of proximate cause and gross negligence or liability for punitive damages. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Headquartered in Minnesota, Loram is a company that operates large rail grinding machines that repair and refurbish railroad tracks.[1] A crew of twelve to fourteen employees travel with a machine for about three months at a time, working thirteen to fourteen hour days (including travel time to and from the motel), up to six or seven days per week. At the end of each day, the crew and their female companions stay at a motel paid for by Loram. Roger Tingle, a crew member of Rail Grinder No. 8, or RG8, and his crew began using crystal methamphetamine in order to stay awake and alert. According to Mr. Tingle, at one time, he was given time off by his supervisors to obtain more drugs for the crew.

On May 26, 1994, Mr. Tingle was strung out on drugs. During the prior week, fellow employees described him as having slurred speech, no longer able to walk upright, appearing exhausted, and glassy-eyed. After working over twelve hours that day, Tingle returned to his motel in El Paso. Mr. Tingle and his wife Patrice began arguing in their motel room. He took her to a car outside the motel and threatened her with a gun. She jumped from the moving car, screaming for help. Mr. Ianni, a police officer, was coming out of a local restaurant. As Officer Ianni approached the vehicle, Mr. Tingle shot him with a .22 caliber pistol. Officer Ianni sustained severe injuries from the gunshot wounds and was unable to work for almost a year. (Mr. Tingle pled guilty to the offense of attempted capital murder and was sentenced to ten years' imprisonment).

Officer Ianni brought suit against Loram, alleging that it was negligent under the following theories: (1) negligent retention of an incompetent, unfit, or dangerous employee; (2) negligent supervision; (3) failure to exercise control properly over an employee (and his wife); and (4) negligent encouragement and aiding and abetting of drug use. Loram sought summary judgment, alleging that it owed no duty to Officer Ianni, that its conduct was not the proximate cause of Mr. Ianni's injuries, and that Officer Ianni could not recover exemplary damages under the test for gross negligence. The trial court granted summary judgment in favor of Loram. This Court reversed the summary judgment and remanded this cause for a trial on the merits. *See Ianni v. Loram Maintenance of Way, Inc.,* 16 S.W.3d 508 (Tex. App.-El Paso 2000, pet. denied) ("*Ianni I*"). After the trial, the jury found in favor of Officer Ianni, specifically finding that Loram proximately caused Officer

---

1. Both parties agree that this Court thoroughly summarized the deposition testimony submitted in the summary judgment proceeding in our opinion in *Ianni v. Loram Maintenance of Way, Inc.,* 16 S.W.3d 508 (Tex.App.-El Paso 2000, pet. denied)("*Ianni I*"), the same evidence which was later admitted at trial. Therefore, we will provide only a brief recitation of the relevant facts and will give particular attention to other evidence admitted at trial where appropriate in our discussion of the issues raised in this appeal.

Ianni's injuries and was grossly negligent, and awarded to Officer Ianni $800,000 in actual damages and $500,000 in punitive damages. Loram now brings this appeal.

## DISCUSSION

The common law doctrine of negligence consists of three elements: a legal duty owed; a breach of that duty; and damages proximately resulting from the breach. *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex.2002); *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987); *Estate of Catlin v. General Motors Corp.*, 936 S.W.2d 447, 450 (Tex.App.-Houston [14th Dist.] 1996, no writ). Proximate cause consists of two elements: (1) cause in fact and (2) foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995).

## DUTY

In Issue One, Loram asserts that it owed no duty of care to Officer Ianni as a matter of law. Specifically, Loram argues *inter alia* that Officer Ianni was not a foreseeable plaintiff within the range of apprehension commensurate with Mr. Tingle's employment, which in this case is "that an employee in a safety sensitive position would cause personal injury or property damage on the job." Loram contends that imposing duty in this instance would be tantamount to making an employer the insurer of the safety of all who come into contact with its employee simply based on that individual's status as an employee.

Duty is a threshold inquiry in a negligence action. *Thapar v. Zezulka*, 994 S.W.2d 635, 637 (Tex.1999); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). The existence of a legal duty is a question of law for the court to decide from the particular facts surrounding the occurrence in question. *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex.1998); *City of McAllen v. De La Garza*, 898 S.W.2d 809, 810 (Tex.1995). We review the trial court's determination of duty on a *de novo* basis. *See El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 312 (Tex.1999). In determining whether to impose a duty, we are to consider the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury and the consequences of placing that burden on the actor. *Bird. v. W.C.W.*, 868 S.W.2d 767, 769 (Tex.1994); *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983).

Generally, a person does not have a duty to control the conduct of another. *See Graff v. Beard*, 858 S.W.2d 918, 920 (Tex.1993); *Otis Eng'g Corp.*, 668 S.W.2d at 309. However, an employer may be liable for the off-duty torts of its employees when, because of an employee's incapacity, an employer exercises control over the employee. *Otis Eng'g Corp.*, 668 S.W.2d at 311, *citing* RESTATEMENT (SECOND) OF TORTS § 319 (1965). Under such circumstances, the employer has a duty to take such action as a reasonably prudent employer under the same or similar circumstances would take to prevent the employee from causing an unreasonable risk of harm to others. *Otis Eng'g Corp.*, 668 S.W.2d at 311. This duty, however, "is not an absolute duty to insure safety, but requires only reasonable care." *Id.* Texas courts have shown an unwillingness to expand the duty to include situations where the employer either had no knowledge of the employee's condition or did not affirmatively exercise control over the employee. *See Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 526–27 (Tex. 1990); *Estate of Catlin v. General Motors Corp.*, 936 S.W.2d 447, 451 (Tex.App.-

Houston [14th Dist.] 1996, no writ); *DeLuna v. Guynes Printing Co. of Texas, Inc.*, 884 S.W.2d 206, 210 (Tex.App.-El Paso 1994, writ denied) (in order for a duty to arise, the employer must not only have some knowledge of the employees condition or incapacity, but must exercise some control or perform some affirmative act of control over the employee).

■■■ Evidence in this case showed that while Superintendents Bernard Soger and Doug Pagliarini denied using amphetamines and stated they had no knowledge of any crew members using drugs, several crew members and the wives offered contrary evidence.[2] Crew member Roderic Collins testified that he was aware of other crew members (including Mr. Tingle) using illegal drugs and had seen Mr. Soger using crystal methamphetamine in one of the motel rooms. Mr. Collins observed Mr. Tingle using crystal methamphetamine, even while operating the machine. He did not tell any supervisor or co-worker because everyone else knew about Mr. Tingle's drug use and were also helping themselves to the drugs. Crew member Dwayne Simpson testified that he observed Mr. Tingle using drugs on the job a few days before the shooting and went to talk to Mr. Pagliarini about it. Cheryl Sipper claimed that Mr. Pagliarini was involved in the crew's drug usage and on two occasions in January 1994, she observed him doing "lines" with night shift leadman Nikolas Kockaniuk and the Tingles.[3] Mr. Kockaniuk testified to seeing Mr. Pagliarini using drugs in a hotel room.

According to Mr. Tingle, at least three-fourths of the crew was using crystal meth, including Mr. Collins, Mr. Kockaniuk, Mr. Pagliarini, and Mr. Soger. Mr. Tingle stated that the crew was taking crystal meth in order to stay awake and alert. According to Mr. Tingle, Mr. Pagliarini had given him time off to get drugs for the crew in Barstow, California. On occasion, Mr. Pagliarini was present when Mr. Tingle was using crystal methamphetamine and at one point gave him some of the drug when he was out. In addition, Mr. Pagliarini had observed Mr. Tingle in an incapacitated state at work because of his drug usage. On that day, Mr. Tingle was not able to function at work and slept on the floor of the cab for about half the day. Mr. Pagliarini knew that Mr. Tingle's conduct was a result of the speed leaving his system. Mr. Pagliarini warned him about it because he was not able to do his job that day, but Mr. Pagliarini did not take further action.

Mrs. Sipper testified about the events leading up to the shooting, in particular, she recounted that Mr. Tingle tried to attack her with a knife at the motel in Deming, New Mexico. Loram's field clerk Frank Nicholson stepped between them and told Mrs. Sipper to get in her car and drive to the Best Western in El Paso, where the crew was headed next.[4] This occurred some days before the shooting. His efforts to control Tingle's behavior was to remove Mrs. Sipper from the scene, but did nothing to protect other innocent individuals who happened into Mr. Tingle's

---

2. Douglas Pagliarini substituted for Mr. Soger during Sogers' vacation. Mr. Pagliarini had been with the crew and machine for about two weeks when the shooting occurred.

3. Contrary to his wife's testimony, Rory Sipper denied ever noticing any drug usage among the crew members.

4. Mr. Nicholson, however, stated in deposition testimony that he never saw Mr. Tingle acting anything other than normal, never saw Mr. Tingle using drugs, and to his knowledge, no one on the crew was using drugs. Mr. Nicholson also stated that he did not know anything about Mr. Tingle attacking Mrs. Sipper with a knife.

path. Mrs. Sipper told Mr. Kockaniuk and Mr. Pagliarini about the attack.[5] In addition, Mr. Simpson had warned Mr. Pagliarini that Mr. Tingle's behavior was worsening and that he needed to do something about it. We conclude that a duty was imposed on Loram not because it had mere knowledge of Mr. Tingle's encouraged drug usage and altered state of mind, that is, his incapacity, but because of its negligent exercise of some asserted control over Mr. Tingle once Loram supervisors acted affirmatively to prevent Mr. Tingle from causing an unreasonable risk of harm to others. *See Otis Eng'g Corp.,* 668 S.W.2d at 311; *Greater Houston Transp. Corp.,* 801 S.W.2d at 526 (discussing the duty imposed on the employer in *Otis Eng'g Corp. v. Clark*). Issue One is overruled.

## CAUSATION

### *Expert Testimony*

Within Issue Two, Loram argues that the trial court erred in allowing Dr. Arthur Ramirez, Officer Ianni's sole expert on causation, to testify over its *Robinson* challenge. *See E.I. du Pont de Nemours & Co., Inc. v. Robinson,* 923 S.W.2d 549 (Tex.1995). Loram contends that Dr. Ramirez was not qualified to testify as an expert on methamphetamine abuse and that his testimony was unreliable.

▮▮▮▮ We review the trial court's ruling that a witness was qualified to testify as an expert under an abuse of discretion standard. *See Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 718–19 (Tex.1998); *Broders v. Heise,* 924 S.W.2d 148, 151 (Tex.1996). A trial court abuses its discretion if it acts without reference to any guiding rules or principles. *Robinson,* 923 S.W.2d at 558. Texas Rule of Evi-

dence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Rule 702 contains three requirements for admission of expert testimony: (1) the witness must be qualified; (2) the proposed testimony must be scientific, technical, or specialized knowledge; and (3) the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." TEX. R.EVID. 702; *Robinson,* 923 S.W.2d at 556. The party offering the expert's testimony bears the burden to prove that the witness is qualified under Rule 702. *See Gammill,* 972 S.W.2d at 718; *Broders,* 924 S.W.2d at 151. Rule 702 also requires that an expert's testimony be relevant and based on a reliable foundation. *See Robinson,* 923 S.W.2d at 556; *Gammill,* 972 S.W.2d at 725.

### *Qualifications*

▮▮▮ Dr. Ramirez was called to testify and offer his expert opinion on three issues: (1) the effect of amphetamines on a person; (2) the effect of amphetamines on Mr. Tingle; and (3) the effect of amphetamine use on Mr. Tingle's behavior. Loram contends that Dr. Ramirez was not qualified to testify as an expert on methamphetamine abuse because only .04 percent of his practice concerns that specialty and because he had never been retained as an expert nor published in that field. At trial, Loram filed a motion to strike Dr. Ramirez's testimony. The trial court conducted a *Daubert* hearing outside the jury's presence on the matter.

5. According to Mrs. Sipper, Mr. Nicholson was with her when she spoke to Mr. Pagliarini about the attack and confirmed her description of events.

Evidence in the record shows that Dr. Ramirez is a psychiatrist and chairman of the Department of Neuropsychiatry at Texas Tech University Health Sciences Center in El Paso where he teaches. Dr. Ramirez holds a specialty certification by the American Board of Psychiatry and Neurology and has diplomat status with the Board. Dr. Ramirez is also certified by the American Board of Forensic Psychiatrists. His professional society memberships include the American Psychiatric Association, the El Paso County Medical Society, the Texas Society of Psychiatric Physicians, the Texas Medical Association, the American Medical Association, and the American College of Forensic Examiners. Dr. Ramirez holds hospital staff appointments at most area hospitals. He has held committee appointments in numerous organizations, which include: Sun Valley Regional Hospital, Life Management Center, William Beaumont Army Medical Center Inpatient Psychiatry Service, El Paso Mental Health Task Force Committee, and Committee of the Whole at El Paso Psychiatric Center. Dr. Ramirez has maintained a private practice in El Paso since 1985.

Dr. Ramirez testified that his work on the effect of amphetamines on individuals makes up less than 1/25th of his practice involving court testimony. However, he sees amphetamine abuse at least once a month, either in his medical school or in his private practice. Dr. Ramirez has had constant contact with amphetamine abuse and either treats it himself or directs residents in how to treat the disorder. Dr. Ramirez admitted that he had never been retained in this type of case and has never published anything on amphetamine abuse. However, he did not think it was significant that he had not published anything on amphetamines because an article on the effects of amphetamines on a person would not be publishable since it has already been described. Dr. Ramirez teaches psychopharmacology, the study of medications used to treat psychotic syndromes and medications that affect the central nervous system. The course work includes teaching how other substances like alcohol, amphetamines, and cocaine can present psychiatric syndromes or disorders. Based on our review of the record, we conclude the trial court did not abuse its discretion in determining that Dr. Ramirez was qualified to testify as an expert on methamphetamine abuse.

### Reliability

Loram also challenges the reliability of Dr. Ramirez's opinions. Pursuant to Rule 702 the trial court must "evaluate the methods, analysis, and principles relied upon in reaching the opinion.... [In order to] ensure that the opinion comports with applicable professional standards outside the courtroom and that it will have a reliable basis in the knowledge and experience of [the] discipline." *Gammill*, 972 S.W.2d at 725–26 (Tex.1998)(internal quotations omitted); *see also* TEX.R.EVID. 702. "The trial court is not to determine whether an expert's conclusions are correct, but only whether the analysis used to reach them is reliable." *Gammill*, 972 S.W.2d at 728. In *Robinson*, the Texas Supreme Court identified several factors to consider in determining whether scientific evidence is reliable and thus, admissible under Rule 702. *Robinson*, 923 S.W.2d at 557. The *Robinson* factors include, but are not limited to: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid

by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. *Id.* Loram asserts that Dr. Ramirez's opinions are unreliable because he: (1) failed to conduct any investigation to rule out alternative causes; (2) reviewed only non-supervisory co-worker deposition testimony; (3) did not personally examine Mr. Tingle; (4) relied entirely on his own subjective interpretation in forming his opinions; (5) made self-serving statements that his technique was accepted in forensic psychiatry; (6) had a potential rate of error in his technique because there was no personal evaluation of Mr. Tingle; and (7) formed his opinions solely for the purpose of litigation.

At the hearing, Dr. Ramirez testified that based on deposition testimony, it was his opinion that the effect of the amphetamines in Mr. Tingle—the aggressivity, the hostility, the shooting of the officer, and marked impulsivity—was fairly classic for amphetamine abuse. Dr. Ramirez was aware that Mr. Tingle's supervisors had denied seeing any signs of Mr. Tingle's amphetamine abuse. However, the supervisors' opinion did not affect his opinion because he relied on the truthfulness of the co-workers' observations of Mr. Tingle and believed that regardless, the fact remained that Mr. Tingle's behavior had changed. Dr. Ramirez explained that while he did not personally observe Mr. Tingle's behavior, whenever examining someone who is abusing drugs, one has to rely on collateral information from a spouse, co-workers, or family because the individual generally denies that he is abusing or using drugs. Dr. Ramirez stated that it is common psychiatric practice to review collateral data in evaluating someone. Dr. Ramirez uses this type of forensic analysis, which is based on records and not personal observation of a patient, outside the courtroom as well. While layper-

sons may not be able to form an opinion as to whether an individual is using amphetamines, in his day-to-day practice laypersons are able to make the kind of observations that he can rely in forming his opinion or making a differential diagnosis. In addition, Dr. Ramirez explained that even if he could have observed Mr. Tingle in jail after the shooting, the amphetamines would have been out of his blood system and Mr. Tingle would have looked pretty normal at that point.

Although Dr. Ramirez was questioned by Loram's counsel about other possible causes for Mr. Tingle's change in behavior, it was his testimony that amphetamine abuse caused Mr. Tingle's behavioral changes. Dr. Ramirez did not rely on any specific textbook in forming his opinion and believed the subject matter was core psychiatric knowledge and that his theory or technique used in analyzing the data in this case involved core clinical practice in psychiatry. To his knowledge, the theory or technique is fairly standard and is taught by himself, the faculty members in his department, and at other medical schools and residency programs.

With respect to whether the technique he used relied upon his subjective opinion, Dr. Ramirez explained that it did not, but rather any ordinary psychiatrist would have arrived at the same opinion. Dr. Ramirez stated that the theory or technique of analysis he used has been subject to peer review and is taught in their general residency program. In fact, at least once a week, Dr. Ramirez also conducts peer review in the residency program on treatment of amphetamine abuse. He also believed that his technique in the diagnosis of amphetamine abuse was fairly standard and not subject to a substantial rate of error. Dr. Ramirez testified that the psychiatric community has generally accepted his underlying theory or technique as valid

and that a majority of psychiatrists would have formed the same opinion in reviewing the same kind of information he had in this case. Further, if a resident came to him with similar information as in this case, Dr. Ramirez would apply the same standards, theory, and technique that he used in forming his opinion for testimonial purposes.

Based on our review of the record, we find there is sufficient evidence supporting the trial court's decision that Dr. Ramirez's testimony was reliable under Rule 702 and that the *Robinson* factors were satisfactorily met. Accordingly, we conclude the trial court did not abuse its discretion with regard to permitting Dr. Ramirez to testify as an expert witness. We overrule this portion of Issue Two.

### Proximate Cause

In Issue Two, Loram also challenges the legal and factual sufficiency of the evidence to support the jury's finding that it proximately caused Officer Ianni's injuries. Specifically, Loram argues that Officer Ianni failed to establish that its alleged negligence was the cause in fact of his injuries and that there was legally and factually insufficient evidence to establish that the shooting was foreseeable.

### Standards of Review

In reviewing a legal sufficiency challenge where the complaining party on appeal did not bear the burden of proof at trial, we analyze the issue as a "no-evidence" challenge. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). In our review, we consider the evidence in a light that tends to support the jury's finding and disregard all evidence and inferences to the contrary. *Southwest Key Program, Inc. v. Gil–Perez,* 81 S.W.3d 269, 274 (Tex. 2002). If there is more than a scintilla of evidence to support the finding, the legal

insufficiency challenge fails. *Formosa Plastics Corp. USA v. Presidio Engr's & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex. 1998). We will sustain a no-evidence challenge when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex.2003). The evidence is no more than a scintilla "[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence...." *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). More than a scintilla exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994).

In reviewing Loram's challenge to the factual sufficiency of the evidence, we consider all the evidence both supporting and contradicting the jury's finding. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Id.* It is not within the province of the reviewing court to interfere with the jury's resolution of conflicts in the evidence, or to pass on the weight or credibility of the witnesses' testimony. *Edmunds v. Sanders,* 2 S.W.3d 697, 703 (Tex.App.-El Paso 1999, pet. denied). Where there is conflicting evidence, the jury's verdict on the matter is generally regarded as conclusive. *Id.*

*Sufficiency of Evidence on Proximate Cause*

 Proximate cause incorporates two elements: cause in fact and foreseeability. *Doe*, 907 S.W.2d at 477. To establish cause in fact or "but for" causation, the complainant must show that the defendant's negligent act or omission was a substantial factor in causing the injury and without which the harm would not have occurred. *See Marathon Corp.*, 106 S.W.3d at 727; *Doe*, 907 S.W.2d at 477. The test for foreseeability is whether a person of ordinary intelligence would have anticipated the danger his or her negligence creates. *Southwest Key Program, Inc.*, 81 S.W.3d at 274, *citing El Chico Corp.*, 732 S.W.2d at 313. The foreseeability element only requires that the general danger be foreseeable, not the precise sequences of events that produced the harm. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex.2001). Proximate cause may be proven by either direct or circumstantial evidence, but it cannot be based upon conjecture, guess, or speculation. *Marathon Corp.*, 106 S.W.3d at 727; *Doe*, 907 S.W.2d at 477.

 The deposition testimony admitted at trial showed that there was widespread drug usage by Loram crew members. Roderic Collins testified that he was aware of other crew members using crystal meth and had seen Loram supervisor Bernard Soger using the drug in one of the motel rooms. Mr. Collins saw Mr. Tingle using drugs while operating one of the rail grinder machines. A few days before the shooting, Dwayne Simpson observed Mr. Tingle using drugs on the job and went to talk to Mr. Pagliarini about it. Mr. Simpson had warned Mr. Pagliarini that Mr. Tingle's behavior was worsening and that he needed to do something about it. Mr. Pagliarini told him that he would look into it. The next day, Mr. Tingle confronted Mr. Simpson and was very angry at him because Mr. Pagliarini had told Mr. Tingle that he had told the supervisor about his problem and Mr. Tingle was concerned that Mr. Simpson was going to turn him in. Mr. Simpson also stated that after the shooting, Mr. Pagliarini told him and other crew members that they were to say that he [Pagliarini] knew nothing about the drug problem. Cheryl Sipper testified that Mr. Pagliarini was involved in the crew's drug usage and that she had told him about Mr. Tingle attacking her with a knife in Deming, New Mexico. Nick Kockaniuk also testified that Mr. Pagliarini had used drugs with the crew.

Douglas Grant, Loram's human resources manager, explained that the company's drug policy included for-cause and random drug testing of employees and that a supervisor had the authority to pull a worker off the rail grinder machine and require a urinalysis. Mr. Pagliarini denied knowledge of any crew members using drugs. He also denied that crew member Dwayne Simpson told him about Mr. Tingle's drug use, but if Mr. Simpson had told him, he would have brought Mr. Tingle in for a urinalysis, which would have meant taking him off of work on the machine until the results of the test came back.[6] Despite the denials, there was contrary evidence that showed supervisory personnel not only encouraged and facilitated the crew's drug usage, but had also participated in the usage.

In addition, the testimony showed that Loram workers were required to work long, grueling hours under harsh working

---

6. Mr. Pagliarini explained that ordinarily the urinalysis procedure involves setting up a hospital visit in which the test is given using Loram's own kit and laboratory. The test would ordinarily be conducted at the location where the crew was currently located.

conditions. Nick Kockaniuk testified that the company's turnover rate was "real high" and that it was a dirty job with long hours in all weather conditions. According to Mr. Tingle, the crew was taking crystal methamphetamine to stay awake and because of the hours that they worked. The average work week was at least eighty hours, excluding travel time to and from the machine. Although days off were scheduled weekly, the crew did not get them on a regular basis and sometimes they went weeks without any time off. In the months preceding the shooting, Mr. Tingle was not getting his days off.

During May 1994, Rory Sipper began noticing that Mr. Tingle was "kind of out of it" and groggy at work. Mr. Sipper thought that Mr. Tingle was "glazed, really out of it," and on one occasion, found Mr. Tingle sleeping in the cab of the machine. He reported his concerns to Mr. Pagliarini, who told him not to worry about it and that he would take care of it. Mr. Kockaniuk testified that after Mr. Tingle began using crystal meth, he became jumpy, jittery, edgy, and fairly excitable. Mr. Tingle lost over forty pounds. By late May, Mr. Tingle was getting worse, in particular, missing work, calling in sick, and his work performance declined. Two or three days before the shooting, Mr. Simpson observed Mr. Tingle using drugs on the job and reported the incident to Mr. Pagliarini. In the days leading up to the shooting, Loram supervisors were aware Mr. Tingle had attacked the companion of a fellow crew member in Deming, New Mexico. Mr. Pagliarini told the victim he did not want to get involved. In his criminal trial testimony, Mr. Tingle stated that he could not remember when the crew moved to El Paso and believed he had been awake for four or five days. The night of the shooting was unclear to him and he could not recall much about the whole month.

The day before the shooting, Patrice Tingle had called EAR, Loram's employee assistance program to see if she could remove her husband from the machine and place him in detox. On the morning of the shooting, Mrs. Tingle contacted the Attorney General's domestic violence number and was told that only her husband's supervisor could remove him from the machine. The Attorney General's office later turned it over to a crisis center, who with Mrs. Sipper, arranged that Mrs. Sipper would call Mrs. Tingle's room that night and if Mrs. Tingle did not answer, Mrs. Sipper was to call the police.

Mr. Pagliarini worked with Mr. Tingle on the day of the shooting and did not notice anything usual about him. Mr. Kockaniuk, however, recalled that when Mr. Tingle was coming off his shift on the evening of the shooting, he had a hollow look in his eyes and his pupils were fully dilated. Mr. Tingle returned to the motel with the crew that night. A little later, Mrs. Tingle called Mrs. Sipper. Mrs. Sipper could hear Mr. Tingle screaming in the background. He then grabbed the phone away from Mrs. Tingle and started screaming at Mrs. Sipper before slamming down the phone. Mr. Tingle was angry with his wife because she had hidden all of the drugs and paraphernalia and refused to give it to him. Mrs. Sipper left her room and was going downstairs when she heard Mr. Tingle screaming and saw the Tingles get into their car to leave. Moments later, she heard the gunshots.

Mr. Tingle testified that he was taking crystal methamphetamine and Valium at the time of the shooting. He had been taking methamphetamine for about ten months and Mr. Pagliarini had knowledge of this drug usage. Before the drug usage occurred, Mr. Tingle and his wife never had any bad arguments, he had never threatened to kill her, had never physically

attacked her, and had never been accused or arrested for spousal abuse. Mr. Tingle believed that if he was not on drugs, he would never have hurt Officer Ianni. Mr. Tingle also stated that if Mr. Pagliarini had reported to the company that he needed to be drug tested in the weeks prior to the shooting, he definitely would have tested positive and been put in a drug rehabilitation program.

According to Dr. Ramirez, based on his clinical experience, the symptoms of amphetamine abuse include hostility, impulsivity, elevated heart rate, sweating, pupillary changes, mood changes, insomnia, confusion, and usually anger or irritability. Based on deposition testimony by Mr. Tingle's co-workers and his wife, Mr. Tingle's drug screening, which revealed amphetamine use, and Mr. Tingle's admission, it was Dr. Ramirez's opinion that the shooting would not have occurred if Mr. Tingle was not using or abusing amphetamines. Dr. Ramirez believed that if Mr. Tingle had been treated for his amphetamine abuse, the shooting would not have occurred. In forming his opinions, Dr. Ramirez considered other general circumstances, like gun possession and marital discord, that may have caused the events in this case along with the specific information that was provided to him. On cross-examination, Dr. Ramirez conceded that he did not know when or how Mr. Tingle took the drugs on the day of the incident nor the frequency of his drug usage.

In deposition testimony, Loram supervisor Bernard Soger explained the company's drug prohibition policy. Supervisors were instructed to look for specific symptoms of drug usage, such as missing work frequently, poor job performance, a decline in job performance, being late for the transport truck, or sleeping on the machine. If a crew member tests positive for drug usage following a urinalysis, that employee would be required to attend a treatment program as a first offense and would be tested more often thereafter. The treatment program must be completed before the employee could return to work.[7]

The evidence at trial is legally and factually sufficient to support the jury's finding that Loram proximately caused the injuries Officer Ianni sustained in his attempt to assist Mrs. Tingle as a result of the dangerous situation that Loram supervisors had created. Loram supervisors knew of the crew's drug usage, and according to a number of witnesses, they actually facilitated and encouraged this drug usage. Despite warnings from co-workers and non-employees, Loram supervisor Doug Pagliarini ignored the escalation in Mr. Tingle's drug abuse and altered behavior and failed to follow standard drug testing and treatment procedures. Loram also failed to take the appropriate actions after Mr. Tingle attacked Cheryl Sipper for attempting to assist his wife. Under these circumstances, we cannot say that Loram could not have anticipated the general danger it created by their negligent conduct. Moreover, the evidence reveals that Loram's negligence was the cause-in-fact of Officer Ianni's injuries in that its negligent

7. It was Mr. Pagliarini's understanding that under the drug policy, if one tested positive for drugs, or if you were suspected of using drugs, that person was taken off the machine. Human Resources Manager Douglas Grant also testified that if a supervisor receives reports that a person is on drugs and notices usual behavior, that individual would be taken out of service and escorted to a clinic or hospital for testing. If that employee refused to be tested, he would be advised that he would be terminated. If the test is positive, the individual is assessed and treated before returning to work. Mr. Grant explained that while the test results were pending, the individual would "stay out of service." That individual would travel with the crew from one location to another pending the results.

conduct was a substantial factor in causing the injury and without which the harm would not have occurred. We recognized that cause-in-fact is not shown if a defendant's negligence merely provided a condition that made the injury possible. *Doe*, 907 S.W.2d at 477. However, in this case, Loram did much more than merely provide a condition, but rather was instrumental in bringing about the harm suffered. We conclude there is legally sufficient evidence to support the jury's finding as well as factually sufficient evidence because the finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. Issue Two is overruled.

## GROSS NEGLIGENCE AND PUNITIVE DAMAGES

### Gross Negligence

In Issue Three, Loram contends the evidence is legally and factually insufficient to establish that Loram was grossly negligent or liable for punitive damages. Specifically, Loram asserts that the employees whom the jury found to be grossly negligent, were not vice principals of the company nor were they acting in a managerial capacity. Further, Loram argues that the evidence is legally and factually insufficient to establish gross negligence under *Moriel.* In our review of this issue, we apply the appropriate standards of review for sufficiency challenges that we set out above in our discussion of Issue Two.

Under the two-prong test for establishing gross negligence in *Moriel:* (1) the defendant's act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the defendant must have actual subjective awareness of the risk involved but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. *Moriel,* 879 S.W.2d at 23. Only if the act or omission is unjustifiable and likely to cause serious harm can it be grossly negligent. *Moriel,* 879 S.W.2d at 22. Where this sort of exemplary damages are sought against a corporate entity, there must be a showing that someone employed in a managerial capacity and acting in the scope of that managerial capacity was grossly negligent. *Dalworth Trucking Co. v. Bulen,* 924 S.W.2d 728, 733 (Tex.App.-Texarkana 1996, no writ), *citing King v. McGuff,* 149 Tex. 432, 234 S.W.2d 403, 405 (1950).

First, Loram argues that the employees whom the jury found to be grossly negligent, Mr. Pagliarini and Mr. Soger, were neither vice principals nor acting in a managerial capacity.[8] Loram asserts that these employees were machine superintendents who were not corporate officers, had no authority to employ or discharge Loram employees, did not engage in nondelegable duties, and were not confided the management of the whole or a department or division of Loram's business.

Ralph Weber, Loram's manager of safety and environment, testified that Loram has 450 employees, half of which

---

8. In Question Number Three, the jury was instructed that for Loram to be grossly negligent, it must find that either Mr. Pagliarini, Mr. Soger, and/or Mr. Kochaniuk were grossly negligent and were employed by Loram in a managerial capacity and were acting in the scope of that managerial capacity. The charge included the following definition: "A person is employed in a managerial capacity of a corporation if (a) he is a corporate officer; (b) he has authority to employ, direct, and discharge employees of the corporation; (c) he is engaged in the performance of nondelegable or absolute duties of the corporation; or (d) the corporation has confided in him the management of (1) the whole of the business or (2) a department or division of the business."

are employed out in the field, operating and maintaining rail grinding machinery on railroad tracks. The average size of a crew is twelve to fourteen people. Mr. Weber explained that the supervisor is the head of one of the rail grinder crews, with the crew chief, field clerk, and night crew lead reporting to him. According to Mr. Weber, the supervisor is the only person that has any real authority on the machine.

In his deposition testimony, Douglas Pagliarini described his function as a supervisor, in particular as relief superintendent, on Rail Grinder number 8 for Loram. His daily duties involved overseeing all the day-to-day operations on the machine, supervision of the crew, maintenance of the machine, and interaction with the customer, the railroad. As supervisor, Mr. Pagliarini stayed with the machine and crew during the shift. Mr. Pagliarini was aware that it was his responsibility to enforce the company's drug policy with regard to the crew. If he had any reasonable suspicion that a crew member was using drugs, he had the authority to request urinalysis. If somebody on the crew had indicated to him that there was drug use among the crew, Mr. Pagliarini would have told Patrick Eischens, the division manager, with whom he was in daily communication. Mr. Eischens made periodic visits to inspect operations once every month or two.

Mr. Pagliarini stated, however, that he did not have authority to change Loram policies or rules in machine operation. He also was not able to hire workers for the crew of RG 8, which was done through Loram's main office in Minnesota. While he could decide unilaterally to fire someone if it was a severe safety matter, he generally would inform his division manager and give his reasons for the dismissal.[9]

Through his deposition testimony, Bernard Soger testified that he worked for Loram from March 1986 to March 1995, being promoted during that time frame from rail grinder operator to leadman to field clerk, and finally to superintendent.[10] Mr. Soger was aware that as supervisor, it was his responsibility to implement the company's drug policy. If another worker had approached him because that worker felt somebody was using drugs, Mr. Soger did not believe that this would give rise to a reasonable suspicion to justify asking for a urinalysis if that individual's job performance was fine. Mr. Soger stated, "I am not going to just give somebody a urinalysis so they can have five days off with pay if I need them on the machine to work, and I don't have reason to believe that they are on any kind of drugs." While a superintendent is encouraged to investigate the circumstances of alleged drug use, Mr. Grant testified that it was never appropriate for a supervisor to ignore a crew member's report of drug use nor was it appropriate for a supervisor to suspect drug use and not report it because

9. Interestingly, Douglas Grant, Loram's human resources manager, testified that if he was contacted by a supervisor and was informed that the supervisor had caught an employee using drugs on the job, he would recommend that the supervisor fire that individual.

10. Mr. Soger explained that an operator maintains and operates the rail grinder machine. The field clerk travels with the crew and handles all of the paperwork, obtains all the spare parts, and coordinates the moving of the crew. Mr. Soger understood his position as superintendent to include the following duties: supervisory authority over the crew and directing and maintaining the rail grinder itself. As superintendent, Mr. Soger was the highest-ranked company official on site and reported directly to Mr. Eischens. Mr. Soger had been a superintendent for about six years before coming to the RG8 crew in January 1994. Prior to that, Mr. Pagliarini had been the crew's superintendent.

he did not want to have downtime on the machine.

The evidence is legally and factually sufficient to establish that Mr. Soger and Mr. Pagliarini were on-site supervisors employed by Loram in a managerial capacity. As supervisors, they were the highest ranked Loram employees on the machine. They were responsible for properly implementing and enforcing the company's drug policy, yet they failed to do so. While machine workers were hired and trained at the main office in Minnesota, once out in the field, they could be fired unilaterally by a supervisor in instances involving severe safety concerns.

Second, Loram argues that there is no evidence that its conduct created an extreme degree of risk because it did not create the likelihood of serious injury to Officer Ianni. See Moriel, 879 S.W.2d at 22. Specifically, Loram asserts there is no evidence to suggest Mr. Tingle was likely to shoot anyone, much less a police officer.

The evidence shows that because of the safety sensitive positions in the organization, Loram had formulated a drug policy that prohibited the use of controlled substances by employees and had adopted a drug testing program to determine the use and/or abuse of drugs by employees that in any way adversely affected their alertness, coordination, reaction, response, or safety. Mr. Soger and Mr. Pagliarini, as on-site supervisors, were responsible for properly implementing the policy, which required for-cause drug testing upon reasonable suspicion. Testimony from Rod Collins, Cheryl Sipper, Nikolas Kockaniuk, Dwayne Simpson, and Roger Tingle provides some evidence that the supervisors were involved in the crew's rampant drug usage and that Mr. Pagliarini, in particular, was repeatedly warned about Mr. Tingle's worsening condition and his attack on Mrs. Sipper in New Mexico. Despite this knowledge, Mr. Pagliarini did not notify upper management, did not remove Mr. Tingle from the machine, and did not request drug testing. While the supervisors did not know the identity of the individual put in harm's way, they objectively knew that their misconduct involved an extreme degree of risk that was likely to cause serious harm to others during the course of the crew's travel with the machine. See Moriel, 879 S.W.2d at 22.

Third, Loram argues that there is no evidence establishing conscious indifference. However, there is some evidence to show that Mr. Pagliarini had actual subjective awareness of the risk involved, but nevertheless proceeding in conscious indifference to the safety and welfare of others. According to witnesses Cheryl Sipper, Nikolas Kockaniuk, and Roger Tingle, Mr. Pagliarini was involved in the crew's drug usage and according to Mr. Tingle, Mr. Pagliarini knew that his trip to Barstow was for the purpose of acquiring more drugs for the crew. Mr. Tingle testified that Mr. Pagliarini had been present when he was using drugs and even gave him some when he was out. Mr. Tingle also stated that Mr. Pagliarini had observed him in an incapacitated state while at work, knew that his condition was a result of drug usage, and gave him a warning.

During May 1994, Rory Sipper observed Mr. Tingle sleeping in the cab of the machine and reported his concerns to Mr. Pagliarini. Mr. Pagliarini told him not to worry about it and that he would take care of it. A few days before the shooting, Dwayne Simpson notified Mr. Pagliarini that Mr. Tingle was using drugs on the job. Mr. Simpson warned Mr. Pagliarini that Mr. Tingle's behavior was worsening and that he needed to do something about it. Mr. Pagliarini said he would look into it and apparently talked to Mr. Tingle who later confronted Mr. Simpson. However,

Mr. Pagliarini took no further action. In the days before the shooting, Mrs. Sipper told Mr. Pagliarini about Mr. Tingle attacking her in New Mexico, but still Mr. Pagliarini failed to take the appropriate action. After the shooting, Mr. Pagliarini told Mr. Simpson and other crew members to say that he knew nothing about the drug problem.

We conclude the evidence is legally sufficient as there is some evidence to support the jury's finding of gross negligence. Further, the evidence in support of this finding is factually sufficient as it is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust.[11] Issue Three is overruled.

For the reasons stated above, we affirm the trial court's judgment.

---

**11.** Within Issue Three, Loram also asserts that the amount of punitive damages awarded by the jury is legally and factually insufficient, but fails to provide any argument in support of their contention nor does it cite to any authorities. Therefore, we find that it has waived this complaint on appeal. *See* TEX. R.APP.P. 38.1(h).